No. 89,466

LATASHA GRIFFIN, A MINOR, BY AND THROUGH EARTHA GREEN,
AND THE FIRST NATIONAL BANK AND TRUST COMPANY OF
JUNCTION CITY, KANSAS, *et al.*, *Appellees*, v. SUZUKI MOTOR
CORPORATION, *Appellant*.

(124 P.3d 57)

Opinion filed December 9, 2005.

*James D. Oliver*, of Foulston Siefkin LLP, of Overland Park, argued the cause, *Wesley A. Weathers*, of Weathers & Riley, of Topeka, and *Lori A. Schweitzer*, of Becherer Kannett & Schweitzer, of Emeryville, California, were with him on the briefs for appellant.

*Lynn R. Johnson,* of Shamberg, Johnson & Bergman, Chartered, of Kansas City, Missouri, argued the cause and *Karen A. Eager,* of the same firm, was with him on the brief for appellees.

*Steve R. Fabert,* of Fisher, Patterson, Sayler & Smith, L.L.P., of Topeka, was on the brief for *amicus curiae* Chamber of Commerce & Industry and The Kansas Civil Law Forum.

*Daniel H. Diepenbrock,* of Miller & Diepenbrock, P.A., of Liberal, was on the brief for *amicus curiae* Kansas Association of Defense Counsel.

The opinion of the court was delivered by

NUSS, J.: This is a products liability case. A sport utility vehicle rollover killed driver Wendy Griffin and injured one of her passengers, her sister Latasha. Wendy's estate, Wendy's heir-at-law, and Latasha ("Griffin") sued Suzuki Motor Corporation (Suzuki) claiming that the design of the sport utility vehicle, a 1994 Suzuki Sidekick, was unreasonably dangerous and defective. The jury found Suzuki 30% at fault and found Wendy 70% at fault, resulting in a judgment of $2.7 million for Latasha against Suzuki.

Suzuki appealed seven evidentiary rulings. The Court of Appeals reversed and remanded for a new trial because it held that two of the rulings violated K.S.A. 60-3307(a)(1) and (2) of the Kansas Product Liability Act (KPLA), K.S.A. 60-3301 *et seq. Griffin v. Suzuki Motor Corp.,* No. 89,466, unpublished opinion filed February 27, 2004. Specifically, the Court of Appeals held the district court should not have allowed into evidence Suzuki's successor vehicle to the Sidekick, the Vitara, as a reasonable alternative design to the Sidekick. It also held the district court should not have allowed into evidence certain engineering and testing standards to analyze the Sidekick because they were not in use when the vehicle had been manufactured in 1994.

We granted Griffin's petition for review pursuant to K.S.A. 20-3018(b).

The issues on appeal, and our accompanying holdings, are as follows:

1. Did the district court admit evidence in violation of K.S.A. 60-3307(a)(2) because it allowed the J-2 vehicle (Vitara) as a reasonable alternative design to the J-1 vehicle (Sidekick)? Yes.

2. Did the district court admit evidence in violation of K.S.A. 60-3307(a)(1) because it allowed testing and engineering standards not in use when the 1994 Sidekick was manufactured? Yes.

Accordingly, we affirm the Court of Appeals, reverse the district court, and remand for new trial.

## FACTS

Because the facts of the accident and the procedural history of the case are not at issue in this appeal, we adopt the following facts as set forth by the Court of Appeals:

"Wendy Griffin was driving her sisters, Latasha and Evelyn, and her brother, Willie, home in May 1999 on U.S. Hwy 77 in Geary County. Wendy was driving a 1994 Suzuki Sidekick. When she removed one hand from the steering wheel to adjust her skirt, the car drifted onto the gravel shoulder on the right. Wendy steered hard left, then hard right, causing the vehicle to slide for a distance until it finally rolled over a number of times. Wendy, Latasha, and Willie were found outside the vehicle after the accident. Wendy later died. Latasha is now a paraplegic with diminished vision in her left eye from injuries she received in the accident. Willie eventually recovered from his injuries. Evelyn, who used her seat belt, was not ejected from the car and received minor injuries.

"The 1994 four-door Sidekick was designed, manufactured, and sold by [Suzuki]. Eartha and Willie Green, Wendy and Latasha's mother and stepfather, purchased the vehicle used in October 1996. The car was built in January 1994.

"Ultimately, three cases were consolidated for trial: Latasha Griffin, by and through her parent, Eartha Green, against [Suzuki] and American Suzuki Motors Corporation (ASMC); Eartha Green, as heir at law of Wendy Griffin against [Suzuki] and ASMC; and Eartha Green and National Bank and Trust Company, Co-Administrators for the estate of Wendy Griffin, against [Suzuki] and ASMC. The trials were bifurcated by dividing the liability and damage portions into separate proceedings." *Griffin v. Suzuki Motor Corp.*, No. 89,466, unpublished opinion filed February 27, 2004.

Griffin's theory of liability was that the 1994 Sidekick was unreasonably dangerous and defective in design and that the defendants negligently designed, manufactured, and tested the vehicle. Defendants responded that the sole cause of the accident was Wendy's negligent driving.

During discovery Suzuki became convinced that Griffin wanted to prove her theory of liability by using Suzuki's replacement for the Sidekick, the Vitara (J-2), as a reasonable alternative design to

the Sidekick (J-1). Accordingly, Suzuki filed a motion in limine to exclude all references to the J-2.

The district court denied Suzuki's motion as well as Suzuki's motion to reconsider. Suzuki made a third written effort, which the court denied. As a result, evidence of the J-2 as a reasonable alternative design to the J-1 (1994 Sidekick) was later admitted at trial.

Suzuki filed two other motions in limine, both of which concerned an April 6, 1999, report by General Motors engineer Ronald Leffert. The first motion sought to prohibit a Griffin expert witness, Wade Allen, from testifying about any opinions formed by his reliance upon Leffert's report. The second motion sought to exclude General Motors' Vehicle Technical Specifications for Stability Margin. The heart of Suzuki's objections concerned Leffert's formula for computing purported minimum rollover safety margins for short-wheelbased vehicles such as the J-1 and J-2.

The record on appeal is not entirely clear as to the district court's exact rulings regarding these two motions. The Court of Appeals concluded, however, that the district court had issued an order in limine prohibiting certain Allen evidence, *e.g.*, Leffert's formula but then permitted the prohibited evidence at trial. *Griffin v. Suzuki Motor Corp.*, No. 89,466, unpublished opinion filed February 27, 2004. The record discloses that significant amounts of Allen's information concerning Leffert's report, including Leffert's formula, were presented to the jury at trial.

After 15 days of trial in which 22 witnesses testified, Griffin dismissed all of the claims against American Suzuki Motors Corporation. The jury rendered a liability verdict, allocating 70% of the responsibility to Wendy and 30% to Suzuki. The parties stipulated to Latasha's past and future economic and noneconomic damages. This resulted in a final judgment for Latasha against Suzuki in the amount of $2,700,438.63.

## ANALYSIS

*Standard of Review*

The Court of Appeals agreed with Griffin and determined its standard of review for the two evidentiary-based issues on appeal

was abuse of discretion citing, among other cases, *Floyd v. General Motors Corp.*, 25 Kan. App. 2d 71, 72-75, 960 P.2d 763, *rev. denied* 264 Kan. 821 (1998), and *DiPietro v. Cessna Aircraft Co.*, 28 Kan. App. 2d 372, 373-74, 16 P.3d 986 (2000), *rev. denied* 271 Kan. 1036 (2001). We disagree with this reliance and the Court of Appeals' conclusion in the instant case. For the reasons set forth below, we agree with Suzuki and hold that our review is de novo.

At the outset, we observe there is no dispute that the evidence at issue is relevant, our threshold consideration when examining appellate challenges to a district court's admission of evidence. See *State v. Carter*, 278 Kan. 74, 77, 91 P.3d 1162 (2004). Generally, all relevant evidence is admissible. K.S.A. 60-407(f); *State v. Meeks*, 277 Kan. 609, 618, 88 P.3d 789 (2004).

Although the evidence is relevant, "overriding considerations of policy," *e.g.*, Kansas statutes, may require its exclusion. See *City of Wichita v. Sealpak Co.*, 279 Kan. 799, 802, 112 P.3d 125 (2005) (citing 4 Gard & Casad's Kansas C. Civ. Proc. 4th Annot. § 60-407 [2003]) (the trier of fact should have all of the relevant evidence which is offered unless some overriding consideration of policy or expediency requires its exclusion). Suzuki argues that the statute, K.S.A. 60-3307, absolutely requires exclusion from evidence the J-2 vehicle and certain of Leffert's information. In other words, there is no room for judicial discretion.

Accordingly, we must interpret this statute. The interpretation of a statute is a question of law, and this court's review is unlimited. An appellate court is not bound by the district court's interpretation. *State v. White*, 279 Kan. 326, 332, 109 P.3d 1199 (2005) (interpretation of the evidentiary statute K.S.A. 22-3220 is a question of law).

Additionally, if we conclude the evidence is excluded by statute, the district court is generally prohibited from admitting it, *i.e.*, there is no discretion to admit. In *Hess v. St. Francis Regional Med. Center*, 254 Kan. 715, 869 P.2d 598 (1994), this court held that per K.S.A. 60-452 and 60-453, offers and acceptances of settlements are generally inadmissible and the "admission of the evidence of settlement was not within the discretion permitted a trial court." 254 Kan. at 720-24; K.S.A. 60-454 (evidence of liability

insurance inadmissible to prove negligence or other wrongdoing); see also *Huxol v. Nickell*, 205 Kan. 718, Syl. ¶ 2, 473 P.2d 90 (1970) (Under K.S.A. 60-451, evidence of subsequent remedial conduct inadmissible to prove negligence or culpable conduct in connection with specific event.).

Finally, "we have observed that even abuse of discretion standards can sometimes more accurately be characterized as questions of law requiring de novo review." *State v. White*, 279 Kan. 326, 332, 109 P.3d 1199 (2005). There, we cited, among other things, *Koon v. United States*, 518 U.S. 81, 100, 135 L. Ed. 2d 392, 116 S. Ct. 2035 (1996), which stated:

"Little turns, however, on whether we label review of this particular question abuse of discretion or de novo, for an abuse of discretion standard does not mean a mistake of law is beyond appellate correction. A district court by definition abuses its discretion when it makes an error of law. . . . The abuse of discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions."

Accord *Dragon v. Vanguard Industries, Inc.*, 277 Kan. 776, 779, 89 P.3d 908 (2004) (abuse is found when district court has gone outside the framework of statutory limitations).

*Discussion*

Issue 1: *Did the district court admit evidence in violation of K.S.A. 60-3307(a)(2) because it allowed the J-2 vehicle (Vitara) as a reasonable alternative design to the J-1 vehicle (Sidekick)?*

Our analysis begins with the statute. K.S.A. 60-3307 provides:

"(a) In a product liability claim, *the following evidence shall not be admissible for any purpose:*
    (1) Evidence of any advancements or changes in technical or other knowledge or techniques, in design theory or philosophy, in manufacturing or testing knowledge, techniques or processes in labeling, warning of risk or hazards, instructions for the use of such product, if such advancements or changes have been made, learned or placed into common use subsequent to the time the product in issue was designed, formulated, tested, manufactured or sold by the manufacturer; and
    (2) *evidence of any changes made in the designing*, planning, formulating, testing, preparing, manufacturing, packaging, warnings, labeling or instructing for use of, or with regard to, *the product in issue, or any similar product, which changes were made subsequent to the time the product in issue was designed, formulated, tested, manufactured or sold by the manufacturer.*

"(b) This section does not require the exclusion of evidence of a subsequent measure if offered to impeach a witness for the manufacturer or seller of a product who has expressly denied the feasibility of such a measure." (Emphasis added.)

To help prove Griffin's theory of liability of the J-1's (1994 Side-kick) dangerous and defective design, she intended to place in evidence the J-2 as her reasonable alternative design. Evidence of a reasonable alternative design in products liability litigation is allowed in Kansas. As this court stated in *Delaney v. Deere and Co.*, 268 Kan. 769, 772-73, 999 P.2d 930 (2000):

"[W]hile the final test is one of consumer expectations, 'in a products liability case involving a claimed design defect, the parties . . . may present evidence as to . . . the feasibility of a safer design. Likewise, evidence may be introduced as to the importance of the need or needs served by the product and its design, the technical and economic feasibility and practicability of serving those needs with a safer design, and the availability of other products, if any, to serve the same needs.' [Citation omitted.]"

Suzuki argues that the J-2 evidence is prohibited by K.S.A. 60-3307(a)(2) as italicized above. Consequently, on March 27, 2002, Suzuki filed a motion in limine to exclude all references "to the new design of the Chevrolet Tracker and the Suzuki Vitara introduced in the 1999 model year, also referred to as the J-2 vehicle, which succeeded the J-1 Geo Tracker and Suzuki Sidekick, sold in various configurations between the 1989-1998 model years." In support of its motion, Suzuki made allegations in support of its apparent argument that the changes from the J-1 to the J-2 were design changes, *e.g.*, subsequent remedial measures which were inadmissible. It stated in relevant part:

"3. It is anticipated that plaintiffs will attempt to suggest that design changes made to the J-2 Chevrolet Tracker and the Suzuki Vitara are admissible in this action as a subsequent remedial measure.

"4. It is also anticipated that plaintiffs will attempt to admit and discuss in front of the jury rollover testing of a J-2 Vitara conducted in 2001 by their expert John Marcosky as an attempted comparison of its performance to that of the 1994 four-door Sidekick.

"5. As a general rule, evidence of subsequent remedial measures is not admissible to prove negligence or culpable conduct. K.S.A. 60-3307(a)(2); K.S.A. 60-451; *Floyd v. General Motors Corp.*, 25 Kan. App. 2d 71, 74-75, 960 P.2d 763 (1998); *Patton v. Hutchinson Wil-Rich Manufacturing Co.*, 253 Kan. 741, 758-759, 861 P.2d 1299 (1993). Indeed in Kansas product liability litigation, evidence

of subsequent remedial measures 'shall not be admissible for any purpose,' with the only exception being to impeach the testimony of a witness for the manufacturer or seller who has expressly denied the feasibility of the proposed remedial measure. K.S.A. 60-3307(b); *DiPietro v. Cessna Aircraft Co.*, 28 Kan. App. 2d 372, 376, 16 P.3d 986 (2000).

"5. [*sic*] Defendants do not deny the feasibility of the design changes made in the J-2 vehicles, and none of their experts is expected to deny the feasibility of these changes."

Suzuki also appeared to argue that the changes were not design changes because the J-2 represented a wholly new design. Accordingly, they were irrelevant and therefore inadmissible.

"6. Also, the J-2 Suzuki Vitara and Chevrolet Tracker represent not a design change but a wholly new design. As such their new design is irrelevant to the design of the subject 1994 four-door Sidekick. (See Inoue Affidavit, Appendix Exhibit B to Defendant GM's Motion for Summary Judgment.)

"7. Kansas courts have recognized that evidence involving other vehicles not similar to the vehicle at issue in a suit may properly be excluded as irrelevant. . . . *Betts v. General Motors Corporation*, 236 Kan. 108, 114, 689 P.2d 795 (1984). . . . *Floyd v. General Motors Corp.*, 25 Kan. App. 2d 71, 72, 960 P.2d 763 (1998).

"8. Numerous jurisdictions have likewise recognized that evidence in product liability cases should be limited to models which are the same or substantially similar to the subject model. [Citations omitted.]

"9. In this case, the only similarity between the 1994 four-door Sidekick and the J-2 Suzuki Vitara is that they are both sport utility vehicles. Plaintiffs simply cannot present any evidence of substantial similarity between the two models. Apropos of plaintiffs' claim that a defect in the 1994 four-door Sidekick led to plaintiffs' accident, defendants note that the 1994 four-door Sidekick and J-2 Vitara have different track widths, suspensions, steering systems and other components, but that there is no evidence that any of these new design features was instituted to correct any deficiency in the handling/stability or rollover resistance of the J-1 Sidekick. As such, they are not 'substantially similar' and any evidence relating to the J-2 Chevrolet Tracker or Suzuki Vitara is irrelevant.

"10. Plaintiffs' attempts to refer to the new design of the J-2 Chevrolet Tracker or Suzuki Vitara are made only with one purpose in mind — to alienate the jurors from the defendants."

Griffin responded on April 9 that K.S.A. 60-451 and 60-3307(a)(2) did not apply. She pointed out that the J-2 incorporated several of the design features that plaintiffs' experts would testify should have been part of the original rollover resistance design, parameters, and characteristics of the J-1. As a result, the J-2 was

evidence of reasonable alternative design recommended by her experts. She therefore argued that plaintiffs should not be precluded from presenting evidence of their reasonable alternative design simply because that design was incorporated in a vehicle designed and manufactured by defendants.

Griffin characterized the J-2 as "the plaintiffs' 'go to' vehicle with regard to rollover resistance design, parameters, characteristics and performance." She specifically argued K.S.A. 60-451, *i.e.*, subsequent remedial conduct, did not apply because Suzuki's witnesses had testified that the change was not remedial, but a "wholly new design."

Moreover, according to Griffin, K.S.A. 60-3307(a)(2) did not render the J-2 evidence inadmissible since Suzuki admitted that the J-2 represents not "a design change, but a wholly new design" and that the J-1 and J-2 are not substantially similar. As a result, under the statute, the J-2 was not "evidence of any changes made in designing . . . *the product in issue*, or *any similar product* . . . . " She argued that defendants could not have it both ways, *i.e.*, could not assert in their pleadings that the J-2 is not the product in issue and is not a similar product, and still assert that Griffin's J-2 evidence is inadmissible pursuant to K.S.A. 60-3307.

At the April 10 hearing on the motion, Suzuki clarified that it was arguing in the alternative. It claimed that Griffin either had to prove that the J-1 and J-2 vehicles were substantially similar, in which case 60-3307 barred the evidence of the J-2, or, if Griffin could not show that the vehicles were substantially similar, then the J-2 evidence was not relevant.

Griffin responded that Suzuki had to be held to its pleadings where it stated that the J-2 was not the product in issue or a similar product; that the J-2 does not incorporate design changes, but is a wholly new design; and that there is no evidence of substantial similarity between the J-1 and the J-2.

The district court ruled at the April 10 hearing:

"I put a lot of thought and a lot of research into this. And, quite frankly, folks, this Court feels that the main contingent in this matter is that the go-to vehicle is a vehicle, and that was produced by and manufactured by the defendants.

"So, I do consider that, or would this argument be going on if this was GM or Chrysler or Ford or someone in that regard?

"Statute is very clear. Is it the product in question? It's been specifically denied. And the defendant — and the plaintiff is not saying that it is, and *the defendant has stated that it's a wholly different vehicle.*

*"Is it similar? Again, it's a wholly different vehicle.* And the Court feels that the plaintiff has the right and opportunity, as the case law would dictate, that they have the right to present a reasonable alternative design.

"This Court has not heard that information as to — and believes that to be a question of fact for the jury as to whether or not that is a reasonable alternative design.

"But for those reasons, and a literal reading of 60-3307(a)(2), this Court will deny the motion in limine in that regard." (Emphasis added.)

On April 25, 2002, Suzuki then filed a motion to reconsider the denial of its motion in limine. It continued to argue that the J-1 and J-2 are "similar products" under 60-3307 and therefore the J-2 evidence should be excluded. As support it stated: "The Sidekick design was 10 years old, so Suzuki replaced the Sidekick with a new, second generation design — the Vitara. It is not the same vehicle, but it is a new design for Suzuki's small SUV product, *i.e.*, a similar product."

Suzuki attached to its motion a deposition excerpt from a Suzuki representative, Masatoshi Nakamura, who testified that the "J-1 is a first generation Tracker and Sidekick." He also testified that the J-2 is "a second generation Tracker and the Vitara." As in Suzuki's initial motion in limine, it again referenced the affidavit from Suzuki engineer Yoshihisa Inoue.

Griffin responded that defendant's arguments did not change the basic fact — the J-2 is evidence of a vehicle that incorporates plaintiffs' reasonable alternative design ("go-to" vehicle) and is not evidence of a design change in the J-1, but rather is a wholly new design.

At the April 26 hearing on the motion to reconsider, Suzuki also argued that excluding its J-2 did not prohibit plaintiffs' experts from asserting an alternative design. Rather, the experts simply could not use Suzuki's J-2 as the alternative design to Suzuki's J-1 Sidekick. It also emphasized that Suzuki's substantial improvements and changes did not detract from the fact that the J-2 was simply

the second generation of the J-1 and became Suzuki's successor small SUV.

After hearing oral arguments on the motion to reconsider, the district court appeared to clarify its earlier ruling. It stated it was not relying upon similarity/dissimilarity. Rather, 60-3307 did not exclude evidence of the J-2 because the J-2 was not *a change* in the J-1, but was "a wholly new design."

"Court again knows that this is a very sensitive issue in this case, and as such, has delved and given it quite a little bit of time. Folks, I've reviewed the material from the last hearing, the case law, and, or course, the motion of the defendant in this case, which was very informative. But the Court's opinion does not change.

"*The Court did not make this determination [of J-2's admissibility] on finding that the Tracker or the Vitara are not similar vehicles. The Court made this decision in applying 60-3307(a)(2) to the facts in this case.*

"The facts in this case are that, defendants have alleged that, one, this was not a change in design; and, two, is not a similar vehicle, but, again, *a wholly different design,* not an upgrade, not an alteration, not a design change, or planning, or formulating, testing preparing, manufacturing, all of those things, it is not a change in any of that, *it's a wholly new design.*

"As such, based upon that, this Court has found, and will still find, that 60-3307(a)(2) has its place, but it's not in this case. The facts do not — that have been presented to this Court are different than the facts and the inadmissible evidence that is considered and should be kept out of 60-3307(a)(2).

"The reason being — *again, I'll be very clear, this is not evidence of a design change, and it's a wholly new design.* Court will find that 60-3307(a)(2), for those reasons, is not applicable. Evidence comes in." (Emphasis added.)

On May 2, 2002, — 5 days before trial began — Suzuki filed a brief in support of its evidentiary objections regarding the J-2. It argued that because the court had twice ruled the evidence of the J-2 was admissible because it was a wholly new design and therefore not similar to the J-1, then the evidence consequently had to be irrelevant to whether the J-1 had been defectively designed. In short, it renewed its alternative position from the original motion in limine. It again cited the Yoshihisa Inoue affidavit to argue the J-2 was dissimilar.

The court denied the requested relief, essentially concluding that the designs of the two vehicles were wholly different; that they therefore did not constitute changes; and that as a result the J-2 evidence was not excluded by 60-3307.

Accordingly, at trial the jury heard testimony from yet another Suzuki representative, engineer Eiji Mochizuki, during Griffin's case in chief. He testified through a translator that the J-2 vehicle is a completely new design. The J-1 had a truck-like ride with a four-passenger capacity, while the J-2 had a five-passenger capacity and was developed to be like a passenger car with a powerful engine, a good ride, and quiet operation.

The Court of Appeals held the admission of the J-2 evidence was reversible error. In doing so, it focused on the similarities between the J-1 and the J-2, concluding that "[a]mple evidence of product similarity was presented at trial." *Griffin v. Suzuki Motor Corp.*, No. 89,466, unpublished opinion filed February 27, 2004. It then described in some detail the similarities between the vehicles. The court seemingly rejected Griffin's argument that the statements in Suzuki's motions were counsel's binding admissions and also that any error was invited by Suzuki.

We disagree with this approach because the determination of a "wholly different design" was a preliminary finding of fact necessary to an evidentiary ruling made by the district court; searching the record for evidence to the contrary exceeds the scope of an appellate court's authority, as explained below.

Before this court, Griffin continues to devote considerable effort to argue that Suzuki is conclusively bound by its statements appearing in its initial motion in limine on the issue. She argues Suzuki's counsel made a binding admission regarding "wholly new design," specifically by paragraphs six and nine of its motion, and strongly suggests Suzuki is estopped from arguing otherwise. She cites, among other cases, *In re Estate of Carrell*, 183 Kan. 491, 496, 327 P.2d 883 (1958).

Likewise, Suzuki continues to devote nearly the same considerable effort to argue the "admission" was merely an alternative pleading, suggesting it was not a fact but a legal argument.

We need not address the parties' detailed positions regarding the effect of Suzuki's counsel's statements and arguments in Suzuki's motions because the district court's finding is supported by the pretrial affidavit of Suzuki's Yoshihisa Inoue. His affidavit dated February 22, 2002, was referenced in Suzuki's own motion in lim-

ine, as well as in its motion to reconsider, and had been provided to the district court as Exhibit F to Suzuki's Response to Plaintiffs' Motion to Add a Claim for Punitive Damages on March 5, 2002. It provided in relevant part:

"1. . . . *All of these vehicles [e.g., J1 and J2] are differently designed vehicles with different design concepts and different design programs.*

. . . .

"14. The J2 vehicles were designed as replacements for the J1 vehicles in part because the J1 vehicles reflected designs that were more than 10 years old. *SMC designed the J2 vehicles from the ground up and incorporated new design features not found in the J1 vehicles.*

"15. *From an engineering and design standpoint, the J1 and J2 vehicles are substantially different.* The center of gravity height, curb weight, gross vehicle weight rating, overall length, interior occupant space, cargo space, fuel tank capacity, body structure, chassis frame, suspension setting and *other numerous significant design details differ between the J1 and J2 vehicles.*

"16. *The J1 and J2 vehicles were designed and developed at different times. There were different design concepts for the J1 and J2 vehicles, and, the J1 and J2 vehicles were developed in different design programs.*" (Emphasis added.)

Because the court's determination that the J-2 was a wholly new design is a finding of fact, it is subject to a substantial competent evidence standard. Substantial evidence is that which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. *U.S.D. No. 233 v. Kansas Ass'n of American Educators,* 275 Kan. 313, 318, 64 P.3d 372 (2003). On appeal, we do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. We also accept as true all inferences to be drawn from the evidence which support or tend to support the findings of the district court. 275 Kan. at 320. After reviewing the Inoue affidavit, we conclude the district court's pretrial finding is supported by substantial competent evidence.

Our affirmation of the district court's factual finding that the J-2 was a "wholly different design," however, merely leads us to the second major step in our analysis: Determining whether evidence of a wholly different design is excluded by K.S.A. 60-3307(a)(2). We first observe that K.S.A. 60-3307(a)(2) makes inadmissible for any purpose, "evidence of *any changes* made in the *designing*

. . . of . . . the product in issue, or any similar product . . . ." (Emphasis added.) The district court's interpretation essentially provides that a wholly different design cannot constitute *any* changes in the original design.

As mentioned, the interpretation of a statute is a question of law, our review is unlimited, and this court is not bound by the district court's interpretation. *State v. White*, 279 Kan. 326, 332, 109 P.3d 1199 (2005). The fundamental rule to which all other rules are subordinate is that the intent of the legislature governs if that intent can be ascertained, and when a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed rather than determine what the law should or should not be. *Schmidtlien Electric, Inc., v. Greathouse*, 278 Kan. 810, 822, 104 P.3d 378 (2005).

Intent of the legislature is to be derived in the first place from the words used. *McCraw v. City of Merriam*, 271 Kan. 912, 915, 26 P.3d 689 (2001). When construing a statute, a court should give words in common usage their natural and ordinary meaning. *Schmidtlien Electric, Inc., v. Greathouse*, 278 Kan. at 822.

The face of the statute makes it clear that any change in the design of a product made after the product is designed, formulated, tested, manufactured, or sold is inadmissible for any purpose, except to meet a defendant's denial of feasibility. As Suzuki correctly observes in its brief, Webster's New Collegiate Dictionary (1980) defines "change" as including "to make different in some particular," and "to replace one with another," and "to make a shift from one to another."

Accordingly, we hold that a "change in design" in a manufacturer's small SUV would encompass a "wholly different design" manifested in the same manufacturer's later generation small SUV serving as a replacement to the original — particularly when, as here, the two generations of vehicles are similar enough to render the later vehicle relevant as evidence for comparative purposes under the doctrine expressed in *Betts v. General Motors Corp.*, 236 Kan. 108, 114, 689 P.2d 795 (1984), and *Floyd v. General Motors Corp.*, 25 Kan. App. 2d 71, 73-74, 960 P.2d 763 (1998).

Although not necessary to our resolution of the issue, we observe that our holding is also consistent with the purposes of the KPLA. Similarly, without our determining that K.S.A. 60-3307(a)(1) was ambiguous, in *Patton v. Hutchinson Wil-Rich Mfg. Co.*, 253 Kan. 741, 861 P.2d 1299 (1993), we discussed its purposes and some legislative history.

*Patton* was a product liability case involving a field cultivator. According to the *Patton* court, the KPLA became effective July 1, 1981, and is based on the Model Uniform Product Liability Act. *Patton v. Hutchinson Wil-Rich Mfg. Co.*, 253 Kan. at 756. "The purpose of the Model Act was to consolidate all product liability actions, regardless of theory into one theory of legal liability." 253 Kan. at 756.

K.S.A. 60-3307, however, was not passed until 1986. See Vargo, The Emperor's New Clothes: The American Law Institute Adorns a "New Cloth" for Section 402A Products Liability Design Defects — A Survey of the States Reveals a Different Weave, 26 U. Mem. L. Rev. 493, 673 (Winter 1996) ("In 1981, Kansas adopted a comprehensive Products Liability Act which severely limited consumers rights. The 1981 Act was amended several times to extend its anti-consumer aspects."). The *Patton* court highlighted the following from some of the 1986 amendment's legislative history:

"Legislative hearings on S.B. 668 (K.S.A. 1992 Supp. 60-3307) included a statement from the President of the Senate, Senator Robert V. Talkington, who supported the bill's passage:

" 'I encourage the committee to support a bill which would prohibit the admission into evidence, during court proceedings, of *information related to normal advancements or changes in* knowledge or techniques of production, *design theory*, and packaging of products.

" '*Normal product changes are a result of the growth of knowledge and not a desire to "cover-up" design inadequacies*. Passage of this measure would not mean victims of poorly designed products would be unable to seek and achieve compensation for injuries sustained from proper use of such products. *What S.B. 668 would do is prevent the mere change of a product or product package being construed in court as an implicit acknowledgment that the "original" design was defective.*

" 'I urge the committee to support this bill to provide an additional element of fairness in our judicial process and encourage economic development and growth

in Kansas.' Minutes of Senate Judiciary Committee, March 6, 1986, A-II." (Emphasis added.) 253 Kan. at 758-59.

The *Patton* court immediately thereafter concluded:

"We believe that 60-3307 is an attempt to codify the wide variety of circumstances that may occur under the rule that excludes evidence of subsequent remedial procedures. See *Wheeler v. John Deere Co.*, 862 F.2d 1404, 1410 n.2 (10th Cir.1988) (farm combine strict product liability case). K.S.A. 1992 Supp. 60-3307 encourages manufacturers to make their products as safe as possible, free from the fear that remedial measures will be used adversely in later litigation. See also K.S.A. 60-451 (relating to subsequent remedial conduct). We view 60-3307 as a 'state-of-the-art' statute which prohibits the introduction of post-manufacture remedial measures, except as provided by 60-3307(b) (evidence allowed to impeach a witness after a manufacturer's or seller's express denial of the feasibility of the remedial measure). See *Siruta v. Hesston Corp.*, 232 Kan. 654, 667, 659 P.2d 799 (1983), for our approval of the admissibility of 'feasibility' evidence before the enactment of 60-3307. We consider the following to be the operative language in the context of the case at bar: 'if such advancements or changes have been made, learned or placed into common use subsequent to the time the product in issue was . . . sold by the manufacturer.' K.S.A. 1992 Supp. 60-3307(a)(1)." *Patton*, 253 Kan. at 758-59.

The *Patton* court also identified the public policy contained in the KPLA, stating: "The legislature, in the KPLA, has clearly declared the public policy of the State. The policy is to limit the rights of plaintiffs to recover in product liability suits generally and to judge a product for an alleged defect only when it is first sold." 253 Kan. at 752.

The *Patton* court, which addressed allegations of a farm implement manufacturer's post-sale duty to warn, also examined the negative practical consequences of accepting an argument by its plaintiff, stating:

"Well-made farm implements last a long time. Durability would be perceived by manufacturers as a negative factor if manufacturers were subjected to post-sale duties. *The rule of law Patton seeks to have us adopt will stifle technology and suppress product safety development. Under Patton's scenario, a manufacturer would be far safer to design a machine intended to wear out in a few years.* Replacement would be required more often, and more machines, albeit inferior ones, would be sold. *Pride of product design and improvement would become secondary to fear of liability. Farmers and implement manufacturers would both be losers.*" 253 Kan. at 752. (Emphasis added.)

To accept Griffin's statutory interpretation is to send a similar stifling and suppressing message to manufacturers, *i.e.*, that their design changes should be incremental, and not extensive. In other words, there should be no wholly different designs, no wholesale innovations, and no successor generations of improved product — even though the extensive changes could be safer, and perhaps cheaper, for the consumer if introduced *now*. As noted in *Patton,* pride of product design and improvement would become secondary to fear of liability. Consumers and vehicle manufacturers would both be losers.

Accepting Griffin's statutory interpretation also is inconsistent with our statement in *Patton* that "K.S.A. 1992 Supp. 60-3307 prohibits the admission: (1) of subsequent product improvements, and (2) 'for any purpose,' not only product *design improvements,* but also later acquired knowledge as to warnings and hazards." (Emphasis added.) 253 Kan. at 751. Such an interpretation is also inconsistent with the legislative history quoted there: " 'a bill which would prohibit the admission into evidence, during court proceedings, of information related to normal advancements or changes in . . . design *theory.*' " (Emphasis added.) 253 Kan. at 758.

As in Griffin's pretrial arguments, she reminds us that she is merely trying to use the J-2 as her reasonable alternative design to show the J-1 was in a defective condition, as is allowed by Kansas law. She argues the J-2 evidence was specifically used by her expert witness Allen to demonstrate the feasibility, adequacy, and effectiveness of his reasonable alternative design and should not be prohibited merely because it too is Suzuki's product.

As in Suzuki's pretrial motions, it responds that a reasonable alternative design is not required and that Griffin may utilize one as long as it is not Suzuki's successor or replacement small SUV.

We agree with Suzuki. Griffin's experts may still assert their alternative designs, including the same changes that may be found in the J-2. But the Kansas Legislature has precluded from evidence the fact that those designs may now be found in a subsequent Suzuki product. K.S.A. 60-3307 is clear: design changes cannot be used for any purpose except to meet a manufacturer's allegation

that the changes are not feasible. And Suzuki has never claimed lack of feasibility.

In short, allowing a manufacturer's later product to be introduced into evidence as a reasonable alternative design to the manufacturer's original product could lead a jury to wrongly conclude the later product is substantial proof that the earlier was defective and that the later product repaired this defect with its new design. This path is contrary to the basic theme contained in 60-3307. *Cf. Patton v. Hutchinson Wil-Rich Mfg. Co.*, 253 Kan. at 759 ("We believe that 60-3307 is an attempt to codify the wide variety of circumstances that may occur under the rule that excludes evidence of subsequent remedial procedures.").

*Effect of trial errors*

Given the erroneous admission of the J-2 evidence, the remaining determination is whether its admission was harmless or reversible error.

K.S.A. 60-261 states in relevant part:

"No error in either the admission or the exclusion of evidence . . . is ground for granting a new trial . . . unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

This court has previously held that harmless error is that which does not prejudice the substantial rights of a party. *Hagedorn v. Stormont-Vail Regional Med. Center*, 238 Kan. 691, 701, 715 P.2d 2 (1986) (erroneous admission of evidence).

The Court of Appeals, although differing from this court on the appropriate standard of review, concluded that "the admission of this evidence constituted reversible error because of the huge role it played at trial." *Griffin v. Suzuki Motor Corp.*, No. 89,466, unpublished opinion filed February 27, 2004. As the court explained:

"In opening remarks, Griffin's counsel told the jury that 'it was technologically and economically feasible to build, to design and build and manufacture the 1994 Suzuki Sidekick with the same rollover resistance design features as the J-2, the 1999 through 2002 Suzuki Vitara and Geo Tracker . . .' Griffin's expert [Allen] testified that the J-1 vehicle failed the three methods for evaluating rollover resistance, while the J-2 passed two tests and there was insufficient data about the

third. Allen went on at length about the differences in design safety features of the J-1 and J-2. During Griffin's closing, the jury was told that Wendy would be alive and Latasha would not be in a wheelchair had Wendy been driving a J-2 vehicle at the time of the accident." *Griffin v. Suzuki Motor Corp.*, No. 89,466, unpublished opinion filed February 27, 2004.

Allen also testified that the J-1 had an unreasonably dangerous and defective rollover resistance design, which contributed to the rollover accident. He concluded that the J-1's rollover resistance performance would have been enhanced by incorporating a wider track width, utilizing a stiffer anti-rollbar, and adding a cross brace between the left and right strut towers. *Griffin v. Suzuki Motor Corp.*, No. 89,466, unpublished opinion filed February 27, 2004. He also testified that in his opinion the J-2 design was a reliable alternative design as it possessed those three attributes missing in the J-1 and would in his opinion minimize the vehicle's rollover propensity. It was Allen's opinion that had Wendy been driving a J-2 vehicle at the time of the accident, the vehicle would have maintained directional stability, would not have left the road, and would not have tipped over. *Griffin v. Suzuki Motor Corp.*, No. 89,466, unpublished opinion filed February 27, 2004.

A further review of the record reveals that Griffin's counsel told the jury that Suzuki had adopted her expert's recommended design changes to the J-1 in the design of the J-2 and reminded them that the J-2, unlike the J-1, did not roll over in its testing. Allen testified that test reports supported his opinion about the design of the Suzuki Sidekick and the alternative designs that he recommended that are incorporated in the J-2.

In short, we agree with Suzuki that Griffin encouraged the jury to conclude that by making the design changes in the J-2, Suzuki had effectively conceded that Griffin's expert was right — that design changes in the J-1 were necessary, that Suzuki had known it since before 1994 when the Sidekick had been manufactured, and that the J-2 design specifically was the fix for the alleged defects in the J-1 design. We therefore conclude, like the Court of Appeals, that the error is reversible.

*Issue 2: Did the district court admit evidence in violation of K.S.A. 60-3307(a)(1) because it allowed testing and engineering standards not in use when the 1994 Sidekick was manufactured?*

Both of Suzuki's additional motions in limine concerned an April 6, 1999, General Motors Corporation NAO Evaluation Report entitled "Analysis of Effects of Engineering Parameters on Field Rollover Rates" written by GM Engineer, Ronald L. Leffert. The first motion, Defendant's Motion to Limit Opinions of Plaintiffs' Expert Wade Allen, was filed March 4, 2002. It sought to prohibit Allen from testifying about any opinions formed by his reliance upon Leffert's report.

The second motion, Defendant's Motion in Limine to Exclude the New GM vehicle Technical Specification for Stability Margin, was filed April 1, 2002. It sought to exclude General Motors' new vehicle Technical Specifications for Stability Margin. Griffin filed responses to both motions which were argued, along with the J-2 motion, on April 10.

The heart of Suzuki's objections related to purported rollover resistance standards for vehicles with wheelbases less than 2,750 millimeters, e.g., the J-1 and J-2. It argued that the formula which produces these standards, i.e., purported minimum rollover safety margins, was first published by Leffert in his 1999 report. Accordingly, the standards, and the formula, represented advancements or changes in technical knowledge, design theory, and testing knowledge that were learned subsequent to the time the 1994 Sidekick was sold by the manufacturer and are therefore barred by K.S.A. 60-3307(a)(1).

Griffin responded that Leffert's analysis was admissible because it did not represent such advancements or changes. She argued that Leffert's analysis was not new knowledge because vehicle "stability margin" had been a concept used to evaluate rollover resistance design since 1986 and that wheelbase had been considered as a parameter as early as 1983. At oral argument, Griffin further argued that Suzuki should have known that the short wheelbase enters into the stability margin formula. Griffin contended that Leffert's analysis was "the same work applying some new data that could have been done back in the early 80's, or it could have been done at any point in time before this vehicle was sold in 1994."

Griffin, however, conceded that in the early 1980's, companies were not using wheelbase in the formula, that it was "sort of dis-

covered by Mr. Leffert when he reviewed all this accident data." She argued Wade Allen simply used Leffert's accident data and the same analysis and they came to the same conclusions.

The district court seemed to deny Suzuki's first motion and sustain the second. It stated:

"But at this point in time, that *stability margin formula* that the parties informed me was adopted in April of 2002, involved a different formula that was not in existence prior to that time, that has come up with a set of numbers that didn't exist prior to that time. *That motion will be sustained as to that narrow formula at this time.*" (Emphasis added.)

The apparent basis for the district court's exclusion, as argued by Suzuki, was subsection (a)(1) of K.S.A. 60-3307, which states in relevant part:

"(a) In a product liability claim, *the following evidence shall not be admissible for any purpose:*

(1) *Evidence of any advancements or changes in technical or other knowledge or techniques,* in design theory or philosophy, *in* manufacturing or *testing knowledge, techniques* or processes in labeling, warning of risk or hazards, instructions for the use of such product, *if such advancements or changes have been made, learned or placed into common use subsequent to the time the product in issue was designed, formulated, tested, manufactured or sold by the manufacturer.*" (Emphasis added.)

As mentioned, the record on appeal is not entirely clear as to the district court's exact rulings and rationale. Technical terms were used interchangeably by almost everyone at crucial times throughout the litigation, *i.e.,* steady state reserve, safety reserve, safety margin, stability margin, steady state rollover propensity margin, rollover safety margin, minimum rollover safety margin, vehicle technical specification, short wheelbase calculation, short wheelbase rollover safety margin calculation, stability margin formula, Leffert's formula, and "schematics of [the Leffert] formula." These times included during the extensive April 10 pretrial hearings on the motions, after the opening statements at trial and during Allen's direct examination. The transcript discloses that during Allen's testimony experienced trial counsel were admittedly confused about the extent of the court's order in limine.

The Court of Appeals concluded that the district court had issued an order in limine prohibiting certain Allen evidence, *e.g.*, Leffert's formula for computing minimum rollover safety margin for short wheelbased vehicles, but then permitted the prohibited evidence at trial. Regardless of the path taken, significant amounts of witness Allen's information concerning Leffert's Report, including Leffert's formula, were presented to the jury at trial.

The Court of Appeals held the error was reversible. In our analysis, we will focus on the evidence that was admitted, not the paths to that admission.

Griffin's evidence included extensive testimony by her expert witness, Allen, and Exhibits 157 and 158 entitled "Vehicle Rollover Resistance Performance Parameters." Highly summarized, her evidence showed a "Rollover Safety Margin" calculated for the J-1 and J-2 4-door vehicles. This Rollover Safety Margin was the result of subtracting each vehicle's Maximum Lateral Acceleration from its Side Pull Ratio (which indicates how hard a person would have to corner a vehicle to get it to tip up, based on acceleration due to gravity, commonly known as G units). This calculation provided a Rollover Safety Margin of .16 for the J-1, and a Margin of .33 for the J-2. Evidence conclusively established that this particular formula had been known in the industry since the 1980's.

Griffin's evidence, however, also revealed use of "Leffert's formula." This formula consisted of dividing the figure of 1.5 by the square of a vehicle's wheelbase. Allen testified that the formula originally was found in Leffert's report dated April 6, 1999. Leffert's report was listed as a reference in Allen's expert report and was marked as Exhibit 16 which Allen discussed during his testimony.

Allen testified that in Leffert's opinion, this formula was needed to provide a better safety evaluation for short wheelbased vehicles than that which was provided by the Rollover Safety Margin. Specifically, a larger Rollover Safety Margin was needed for vehicles with a wheelbase less than 2,750 millimeters. According to Allen, Leffert had come to this conclusion after looking at rollover statistics for short-wheelbased vehicles; Allen found this large amount of data relatively reliable.

According to Allen, the quotient resulting from the Leffert formula — as derived from the analysis done in Leffert's report — established a minimum rollover standard for vehicles with a wheelbase less than 2,750 millimeters. He described it as a "minimum rollover safety margin" and testified that "Leffert used it in that way." When Allen was specifically asked for his opinion concerning an adequate rollover safety margin for a vehicle with a wheelbase of less than 2,750 millimeters, he stated: "Well, Leffert gives us a formula — and his formula is 1.5 divided by the square of the wheelbase . . . by itself, and then you divide that into 1.5, and he [Leffert] says that the safety margin should be greater than that number." Allen readily agreed Leffert's formula was a good way to analyze the Rollover Safety Margin for a short wheelbase vehicle and that "Adequate Rollover Safety Margin makes it less likely the vehicle would tip."

When Allen used Leffert's formula to calculate the minimum standard for a vehicle possessing the same short wheelbase as the J-1, his calculations yielded the figure of .244. As mentioned, however, according to Exhibits 157 and 158, the J-1's actual Rollover Safety Margin was .16 — which Allen testified was "below that number that Leffert tells us should be used for this particular vehicle." By contrast, Allen's testimony, along with Exhibits 157 and 158, showed that the J-2's actual Rollover Safety Margin of .33 was well above Leffert's calculated minimum of .244. As Allen pointed out to the jury, the J-2 "more than doubled the tip up margin" of the J-1: .16 versus .33. He concluded that the J-1 failed in the Rollover Margin evaluation, but that the J-2 did not.

The record establishes that before the publication of the Leffert report and formula in 1999, there was no test that purported to quantify the effect of a shorter wheelbase on rollover resistance. Clearly no minimum rollover safety margin had been defined based on a vehicle's wheelbase.

The minimum rollover safety margin for vehicles with shorter wheelbases, as determined by the Leffert formula contained in the Leffert report, is clearly an advancement in technical testing knowledge that was learned subsequent to the time the 1994 Sidekick was sold by the manufacturer. We therefore agree with Suzuki that

although Leffert's formula was not a standard of testing in 1994, the implication was made that Suzuki was laggard and culpable in 1994 for not designing a vehicle that would pass a test that did not then exist.

Accordingly, we agree with the Court of Appeals that K.S.A. 60-3307(a)(1) prohibits such evidence. Leffert's minimum margin, calculated by Allen to be .244, as well as evidence of Leffert's formula, should have been excluded by the district court.

Griffin argues that Suzuki did not preserve this evidentiary error for appeal. Specifically, she claims that though the court may have granted Suzuki's motion in limine, Suzuki made no contemporaneous objection to Allen's testimony the morning of May 8 that the short wheelbase formula was one appropriate evaluation of the rollover stability of a short wheelbase vehicle. She cites *State v. Decker*, 275 Kan. 502, 507, 66 P.3d 915 (2003) (if a motion in limine is granted to preclude the introduction of certain evidence, the later failure to object at trial results in the issue not being preserved on appeal). While she admits that during the afternoon session on May 8 when Allen provided additional testimony concerning the short wheelbase formula that Suzuki's counsel did object that it violated the district court's order in limine, she complains that Suzuki did not also move to strike or request the jury to disregard such evidence. She suggests such requests are requirements for preserving the objection, citing *State v. Campbell*, 268 Kan. 529, 538, 997 P.2d 726 (2000).

We agree with Suzuki that we need not address Griffin's arguments because her contemporaneous objection issue was not raised below. It does not appear in her brief to the Court of Appeals or in her petition for review setting forth the issues she wanted to argue to this court in the event her petition was granted. It appeared for the first time in her brief to this court. Raising her argument now conflicts with Supreme Court Rule 8.03(g) (2004 Kan. Ct. R. Annot. 58) and our decision in *Telegram Publishing v. Kansas Dept. of Transportation*, 275 Kan. 779, 794, 69 P.3d 578 (2003) (citing *Hephner v. Traders Ins. Co.*, 254 Kan. 226, 231, 236, 864 P.2d 674 [1993]) (Issues cannot be raised for the first time at this level.).

We also observe that Suzuki had been granted a continuing objection to the Leffert information before trial began, in conjunction with its motion in limine. Thus, Suzuki's issue was preserved for appeal. A very similar situation occurred in *State v. Parker*, 277 Kan. 838, 845, 89 P.3d 622 (2004), where we stated:

"Where the trial court has granted counsel's request for a continuing objection to evidence excluded by an order in limine, the trial court is in a position to avert error on account of the introduction of objectionable evidence. Thus, the rationale underlying the contemporaneous objection rule has been met, and the issue is preserved for appeal."

*Effect of trial errors*

We also agree with the Court of Appeals that the admission of the Leffert evidence was not harmless under K.S.A. 60-261. *Griffin v. Suzuki Motor Corp.*, No. 89,466, unpublished opinion filed February 27, 2004. During a 3-week jury trial in which a considerable amount of conflicting, and at times confusing, engineering studies and other scientific evidence is presented by both sides, a jury could easily seize upon perceived certainties such as mathematically computed "minimum rollover standards" of safety for short wheelbased vehicles that an expert witness testifies should have been met. The jury could then just as easily conclude that when the J-1 vehicle's mathematically computed Rollover Safety Margin fell approximately 33% below these purported minimum rollover standards, the vehicle is "inadequate" and therefore unsafe. This was certainly a major tenet of Allen's testimony.

We hold that this evidence prejudiced the substantial rights of Suzuki. See *Hagedorn v. Stormont-Vail Regional Medical Center*, 238 Kan. 691, 701, 715 P.2d 2 (1986).

The problem of the "mathematically inadequate" J-1 is exacerbated by the testimony and exhibits demonstrating that the J-2's margin is not only double that of the J-1's, but also that the J-2's margin exceeds Leffert's minimum standards for short wheelbased vehicles by approximately 35%. This comparison of vehicles relates back to the problem discussed in issue 1: the prejudicial use of a company's later product to prove its predecessor was defectively designed.

The Court of Appeals is affirmed, the district court is reversed, and the case is remanded for new trial.

ALLEGRUCCI, J., dissenting.