(238 P.3d 293)
No. 101,457

ESTATE OF JEFFREY MILLS, by and through its Special Administrator, LARRY MILLS; CARRIE LYNN TUCKER, individually; and ELIZABETH MILLS, SADIE MILLS, and ROSS MILLS, Heirs at Law, by and through CHARLES E. WORDEN, Guardian ad litem, *Appellants*, v. EDWARD L. MANGOSING, M.D., TODD RIGGS, D.O., and DOMINADOR PERIDO, M.D., *Appellees*, and BOARD OF COUNTY COMMISSIONERS OF MORTON COUNTY, *Defendant.*

Opinion filed August 20, 2010.

*Matthew L. Bretz*, of Bretz Law Offices, LLC, of Hutchinson, for appellants.

*Matthew P. Sorochty*, of Woodard, Hernandez, Roth & Day, LLC, of Wichita, for appellee Edward L. Mangosing, M.D.; *Brian C. Wright*, of Law Office of Brian Wright, of Great Bend, for appellee Todd Riggs, M.D.; and *Gregory S.*

*Young* and *Roger M. Theis,* of Hinkle Elkouri Law Firm, L.L.C., of Wichita, for appellee Dominador Perido, M.D.

Before STANDRIDGE, P.J., GREEN and HILL, JJ.

GREEN, J.: In this wrongful death action, the Estate of Jeffrey Mills, by and through its Special Administrator, Larry Mills; Carrie Lynn Tucker (formerly Mills), individually; and Elizabeth Mills, Sadie Mills, and Ross Mills, heirs at law, by and through Charles E. Worden, guardian ad litem (collectively appellants—the plaintiffs at trial), appeal from the jury's defense verdict in favor of Edward L. Mangosing, M.D., Todd Riggs, D.O., and Dominador Perido, M.D. (collectively appellees—the defendants at trial). The appellants raise three issues on appeal.

First, the appellants argue that the trial court erred in allowing a defense expert to testify about how he had treated Hantavirus patients in his personal practice, which was in violation of an order in limine. Nevertheless, because the appellants failed to contemporaneously object to the majority of the expert's testimony concerning his personal treatment of Hantavirus patients, they failed to preserve for appeal the issue concerning that testimony. Moreover, in the instances when the appellants did object to the expert's testimony and the trial court overruled the objections, the testimony was similar to that given by other experts in the case and did not violate the order in limine.

Next, the appellants contend that the trial court abused its discretion in not ordering a new trial based on the testimony concerning Carrie's medical treatment for Hantavirus, which was in violation of an order in limine. Because the appellants did not contemporaneously object to most of the testimony concerning Carrie's treatment for Hantavirus, they failed to preserve for appellate review any issue concerning that testimony. Moreover, the testimony was in line with the trial court's ruling concerning evidence pertaining to Carrie's Hantavirus illness, especially in light of the fact that the appellants had previously made statements and introduced evidence concerning Carrie's hospitalization for Hantavirus.

Finally, the appellants maintain that the defense verdict rendered by the jury was contrary to the evidence presented at trial.

Nevertheless, in considering the evidence introduced at trial in the light most favorable to the appellees, we conclude that the evidence supported the verdict. Accordingly, we affirm.

*Carrie's Illness*

Jeff and Carrie Mills were married and had three children together. In May 2003, while visiting her sister in Joplin, Missouri, over a weekend, Carrie complained of having a headache and being fatigued. When Carrie became sicker and began running a fever, Carrie's sister, Dr. Diann Hunter, a pediatrician, took Carrie to the hospital and ordered a complete blood-count test. After ordering the test, Carrie's condition worsened. As a result, she was taken in the middle of the night to the hospital emergency room in Joplin. The next day, Carrie was taken by air ambulance to the University of Kansas Medical Center (KU Med). Carrie's condition improved, and she was later transferred on May 24, 2003, to a hospital in Garden City so that she could be closer to her home in Rolla, Kansas.

*Hantavirus*

It was later determined through testing that Carrie had contracted Hantavirus. Hantavirus is a relatively recent viral illness in humans in the United States. Rodents are the normal carriers of Hantavirus, and it is thought that the disease existed in rodents in the United States in the mid-1980's. In 1993, the Hantavirus disease emerged in humans in the Four Corners: a region consisting of southwest Colorado, northwest New Mexico, northeast Arizona, and southeast Utah. This disease has spread to other states, including Kansas.

The fatality rate for Hantavirus is extremely high. When the first outbreak occurred in 1993, the fatality rate was about 80%. In 2003, however, the fatality rate had dropped to about 35%.

There are two distinct phases of Hantavirus: the prodrome phase and the cardiorespiratory phase. In the prodrome phase, the infected person will have flulike symptoms such as fever, chills, nausea, and vomiting. The cardiorespiratory phase is when Hantavirus transitions into a frightening and deadly form of the disease characterized by shock and pulmonary edema. The transition from the

prodrome phase to the cardiorespiratory phase can happen within a matter of a few hours in an infected person.

Hantavirus is a viral illness, and there is no curative treatment for the disease, only symptomatic treatment or supportive care. Based on an infected patient's symptoms, the supportive care of Hantavirus can require the giving of oxygen and the management of blood pressure initially through IV fluids and then later through the ventilator and pressor support. Cardiogenic shock is responsible for the majority of Hantavirus deaths.

## Jeff's Illness

Jeff first complained of fatigue and a headache on Saturday, May 24, 2003, when he was following Carrie's ambulance to Garden City. Throughout the weekend, Jeff continued experiencing fatigue and flulike symptoms. On Sunday, May 25, 2003, Jeff mowed part of their 1-acre yard with a push mower to attempt to "work [his illness] out."

## Monday, May 26, 2003

On Monday, May 26, 2003, which was Memorial Day, Jeff was still experiencing fatigue and was running a fever. Jeff was in a band and was supposed to play at an engagement in Hooker, Oklahoma, which was approximately 45 miles away from his home, that evening. Carrie testified that Jeff wanted to fulfill his obligation to play that evening, but she wanted to get him to a doctor in the hopes that the doctor would tell him not to play that evening.

Hunter testified that she talked with Carrie on May 26 about Carrie's difficulty in getting Jeff to see a doctor. According to Hunter, Jeff did not want to go to the doctor, and Hunter had to encourage Jeff to seek medical care. Hunter testified that she had a conversation with Jeff about the seriousness of Hantavirus. Hunter told Jeff that just because Carrie was able to recover did not mean he could get better and that Hantavirus had what she believed was a 50% fatality rate. Carrie testified, however, that she did not remember talking to Hunter about how Jeff would not listen to her. Moreover, Carrie testified that she did not remember Hunter having such a conversation with Jeff.

Jeff went to the emergency room at Morton County Hospital on May 26, 2003. Dr. Todd Riggs was Jeff's treating emergency room physician. During the visit, Jeff complained of a low grade fever for the past 4 or 5 days; tiredness; achiness; and a dry, nonproductive cough. According to Jeff's medical chart, Jeff stated during the visit that his wife had been diagnosed with Hantavirus and that he was concerned about being exposed to the virus. While he was in the emergency room, Jeff's temperature was 99.9 (after taking Tylenol approximately 41 minutes before) and his pulse was tachycardiac at 112 beats per minute. A complete blood-count profile showed that Jeff's platelet count was 118,000. The normal platelet range is 130,000 to 400,000.

Riggs testified that by the end of Jeff's emergency room visit, he thought there was a good chance that Jeff was in the prodrome phase of Hantavirus. Riggs did not call in a consult or look at any texts, journal articles, or learned treatises about Hantavirus on May 26. Moreover, Riggs did not order a follow-up complete blood-count profile for Jeff or a Hantavirus test on May 26.

Riggs testified that during the May 26 visit he suggested that Jeff see the same pulmonologist that had treated Carrie and that Carrie follow up with the same facility that had treated her because Riggs did not have any experience with Hantavirus. Nevertheless, Carrie testified that she did not remember Riggs saying those things. Riggs discharged Mills from the emergency room with instructions to increase fluids; rest; watch for shortness of breath and cough; and return to the emergency room if the symptoms increased. Riggs diagnosed Mills with sinusitis, upper respiratory infection, and possible exposure to Hantavirus.

Later that day, Jeff drove to Oklahoma with his 8-year-old daughter to play in his band that evening. During the engagement, Jeff was not feeling well and did not help set up or tear down the band equipment. Carrie testified that when Jeff got home from the engagement, he was very tired and lay in the recliner covered up with a blanket for the rest of the evening.

*Tuesday, May 27, 2003*

On the morning of Tuesday, May 27, 2003, Carrie called Morton County Hospital to find out the results of Jeff's Hantavirus test but

learned that no Hantavirus test had been ordered. Carrie was told that a Hantavirus test could still be ordered on the blood that had been drawn from Jeff the previous day. Dr. Riggs ordered a Hantavirus test on May 27.

That same morning, Carrie attempted to get an appointment with the doctor who had recently treated her in Garden City. Because that doctor was not in that day, Carrie made an appointment for that afternoon with Dr. Edward Mangosing in Garden City. Carrie's mother went with them to the appointment in Garden City, which was about 90 minutes from Rolla.

Mangosing testified that when he saw Jeff on May 27, Jeff was exhibiting all of the symptoms that would cause a doctor to suspect Hantavirus. Jeff complained of body aches, fever, cough, sleeplessness, and headache. Mangosing ordered a complete blood-count profile, which revealed that Jeff's platelets had dropped to 89,000. Mangosing testified that about half of the results from Jeff's complete blood-count profile were abnormal. Mangosing also ordered a chest X-ray, which showed increased pulmonary markings. Mangosing had never treated a patient with Hantavirus. Mangosing did not call in a consult or attempt to look at any of the texts in the hospital concerning Hantavirus.

Mangosing testified that during the May 27 visit, he recommended that Jeff be admitted to the hospital, but Jeff did not respond. Carrie testified, however, that she did not remember Mangosing mentioning going into the hospital. Mangosing further testified that Carrie told Jeff, "Do not tough it out." According to Mangosing, he took Jeff's lack of response to mean that Jeff did not want to be admitted to the hospital. Mangosing told Jeff that he may go home and gave him a script for a repeat complete blood-count test to be done the following day. Mangosing's discharge instructions were as follows: "Repeat CBC in a.m.; call if increased cough, shortness of breath."

Mangosing testified that when he saw Jeff on May 27, no supportive measures were needed at that time because Jeff's vital signs were normal. Mangosing testified that Jeff had normal blood pressure, pulse, temperature, and respirations; that his oxygen saturation level of 94% was normal; that his chest and lungs were clear;

and that Jeff did not appear to be in distress, other than an occasional nonproductive cough and slight flushing of the face, at the visit. Moreover, Mangosing testified that he had ordered a complete metabolic profile to check Jeff's blood sugar, kidneys and liver, and electrolytes, and the comprehensive results were normal. Mangosing further testified that Garden City had the capability of handling the supportive measures that would have been required for Jeff.

Mangosing testified that he did not tell Jeff that Hantavirus could progress and become life threatening. Mangosing further testified that he did not tell Jeff the different ways that Hantavirus could be treated when it progressed.

Carrie's mother, Elizabeth Easterwood, testified that when Carrie and Jeff came out of Mangosing's office, they had a discussion in the lobby that Mangosing would put Jeff in the hospital but that Jeff preferred to go to Elkhart. According to Easterwood, Jeff preferred to go to Elkhart because it was closer to home and they could give him the same treatment of IV fluids and oxygen. Nevertheless, Carrie testified that she did not believe that such a discussion occurred. According to Carrie, there was a discussion in the lobby about whether they needed to come back to Garden City for the complete blood-count test or whether they could go to Elkhart, which was only 15 minutes from Rolla, for the test.

*Wednesday, May 28, 2003*

On Wednesday, May 28, 2003, Carrie took Jeff to Elkhart to have blood drawn for the complete blood-count test ordered by Mangosing. Carrie later called Mangosing's office and left a message that Jeff had a fever, a headache, and body aches. The complete blood-count profile showed that Jeff's platelets had further decreased to 45,000. Mangosing directed his nurse to advise Jeff that he needed to be admitted to the hospital.

Carrie later got a call from a nurse at Garden City and was told that Jeff's platelets were low and that he needed to be admitted to the hospital. Carrie testified that when she asked whether she should take him to Garden City or Elkhart, she was told, "Just get

to a facility." Carrie testified that she and Jeff decided to go to Elkhart.

Dr. Dominador Perido saw Jeff in the emergency room in Elkhart at about 12:39 p.m. on May 28th. Perido was Carrie's parents' family physician. Although Perido was not Carrie's doctor growing up, Perido had known Carrie's parents for at least 30 years. Moreover, Perido had been Hunter's physician, and Hunter would stop by to see Perido when she visited Rolla. Hunter testified that Perido had always been accessible to her and to her family for medical issues.

Perido testified that when he saw Jeff on May 28, he asked Jeff and Carrie why they were coming to see him, a general surgeon who was a family practitioner in a small town. Nevertheless, Carrie testified that Perido did not say anything like that when he saw Jeff on May 28. Carrie testified she and Jeff wanted Jeff to be sent somewhere else and that she believed that they asked Perido for that. Carrie testified that she did not remember Perido's response to their request. Perido testified that Jeff was still physically able to have been transferred to a tertiary care facility in the afternoon and that he talked with Jeff and Carrie about different treatment options and about being transferred to a tertiary care facility.

Perido admitted Jeff to the main floor of the hospital on the afternoon of May 28 in order to stabilize him and give him supportive treatment. The hospital in Elkhart is a 22-bed hospital with a one-room intensive care unit. On Wednesday afternoon, Jeff's platelets had dropped to 34,000, his lymphocytes were low, his heart was tachycardiac, his oxygen saturation level was below normal, and several other test results were abnormal. That afternoon, Perido received Jeff's Hantavirus test result, which was positive.

As the afternoon of May 28 progressed, oxygen had to be administered to Jeff because of his declining oxygen saturation rate. By 7:55 p.m., Jeff had to be put on 100% oxygen with a nonbreather mask. A chest X-ray showed "interstitial changes in both mid and lower lung fields with bilateral pleural reaction."

*Thursday, May 29, 2003*

By 6:25 a.m. on May 29, 2003, Jeff's platelets had dropped to 19,000. In addition, Jeff had marked weakness and his pulse rate

had gone up to 136 beats per minute when he got up to go to the bathroom that morning. At 7:45 a.m., Perido told Jeff that he needed to place him in intensive care to watch his blood pressure and give him further supportive care. Perido also called Dr. Belino Iway, an internal medicine doctor in Elkhart, to consult with him about Jeff's condition.

When Iway arrived at the hospital on the morning of May 29, Jeff was in the ICU and had been intubated and put on a ventilator to help with his breathing. Iway's assessment was that Jeff was in acute respiratory distress and should be transferred to KU Med. According to Iway, the hospital in Elkhart could give immediate critical care, but it would be difficult to provide such care in the long term.

It took approximately 6 hours to find a bed for Jeff in a tertiary care facility. Arrangements were made for Jeff to go to KU Med, and the air ambulance crew flew from Liberal to Elkhart to take Jeff there. As Jeff was being rolled out of the intensive care unit, however, he crashed and was too unstable to make the transfer. Despite efforts to stabilize him, Jeff died in Elkhart.

*Filing of Lawsuit*

The appellants filed suit in May 2005, and a first amended petition in September 2005. Perido was not originally named in the suit. Apparently, Riggs and Mangosing alleged that Perido was negligent and caused or contributed to Jeff's death. As a result, a second amended petition was filed in November 2006 naming Perido as a party defendant. The trial was held in June 2008.

*Appellants' Expert Dr. Hjelle*

Dr. Brian Hjelle, a clinical pathologist in Albuquerque, New Mexico, testified that Jeff's Hantavirus test came through the lab where he read Hantavirus test results. According to Hjelle, he called Riggs on May 28 after he knew that the Hantavirus test result was going to be positive and asked about Jeff's clinical information to determine if it was consistent with Hantavirus. Hjelle testified that upon learning that Jeff's condition was consistent with Hantavirus, he told Riggs that Jeff should be referred to a tertiary care center quickly because Hantavirus patients "go bad so quickly with

this disease." Hjelle testified, however, that he got the distinct impression that Riggs was not planning to actively transfer Jeff to a tertiary care center. At that time, Jeff was in the hospital at Elkhart under Perido's care.

Hjelle testified that it is extremely well-accepted in the field that the appropriate step to improve the chance that a Hantavirus patient will survive is to transfer the patient to a tertiary care center. Hjelle explained that at a tertiary care center, there are usually experienced intensivists and physicians who are used to working with patients in shock. Moreover, some tertiary care facilities, like KU Med, have treated patients with Hantavirus.

Hjelle further explained that there are nuances in the management of Hantavirus that are not immediately apparent to those who do not have experience with the disease or who have not talked with physicians who have experience with the disease. Hjelle testified that a Hantavirus patient should not be at a location where the patient cannot be actively and aggressively managed and monitored when the transition from the prodrome phase to the cardiorespiratory phase occurs.

Hjelle testified that his opinion was that Riggs deviated from the standard of care on May 26 by failing to transfer Mills to a tertiary care center, by failing to get a consult, by not ordering a chest X-ray, and by not ordering a Hantavirus test. In addition, Hjelle testified that, in his opinion, Mangosing deviated from the standard of care on May 27 by failing to transfer Jeff to a tertiary care facility, by discharging Jeff home based upon Jeff's lack of response to Mangosing's recommendation for admission to the hospital, and by not thoroughly explaining to Jeff the high potential of a lethal outcome if Jeff was discharged to home. Hjelle further testified that Perido deviated from the standard of care on May 28th when he admitted Jeff to the floor and did not transfer him to a tertiary care facility.

According to Hjelle, his opinion was that Jeff would more likely than not have survived if Riggs had complied with the standard of care on May 26. Hjelle's opinion was based upon the "likely significantly better management of things like fluid and pressor administration and all those things that go with having an intensive

care unit that's well-qualified and very experienced with dealing with shocky patients."

Hjelle further testified that Jeff would more likely than not have survived if Mangosing had complied with the standard of care on May 27. Hjelle opined that Jeff would have received state of the art shock, fluid, and pressor management in a modern and experienced tertiary care center that would be used to seeing patients with shock. Similarly, Hjelle testified that had Perido complied with the standard of care on May 28, Jeff would more likely than not have survived. According to Hjelle, if Jeff would have been at a tertiary care facility, he would have been "in the hands of people with a great deal more experience with gravely ill patients who are suffering conditions" such as Hantavirus.

### Appellants' Expert Frires

Dr. Richard Frires, the director of an emergency department at a hospital in Cleveland, indicated that both Mangosing and Riggs deviated from the standard of care by not obtaining a consult and by not transferring Jeff to a tertiary care center. Frires further opined that Perido deviated from the standard of care by not transferring Jeff to a tertiary care center on May 28.

### Riggs' Expert

Riggs presented testimony from Dr. Richard Dellinger, who was the director of a surgical cardiovascular intensive care unit at a greater Philadelphia, Pennsylvania, hospital. Dellinger testified that when he performed shift work in the intensive care unit, he was responsible for the care of 14 to 18 patients, the majority of which were on breathing machines and mechanical ventilators and could require medications to support their blood pressure and cardiovascular systems. Dellinger further testified that he had never treated a Hantavirus patient but had treated patients with similar pulmonary, respiratory, and cardiovascular issues.

Dellinger testified that his opinion was that, more likely than not, consultation with an infectious disease specialist on May 26; admission of Jeff to the hospital on May 26; and transfer to a tertiary care center on May 26, 27, or 28, or after he was admitted to the hospital would not have altered Jeff's outcome. According to

Dellinger, even if Jeff would have been in the biggest intensive care unit in the biggest city, that, more likely than not, would have made no difference in Jeff's outcome. Dellinger testified that based upon Jeff's severe degree of pulmonary edema and cardiovascular issues, any additional things that might have been done at a tertiary care center would not have made a difference in Jeff's outcome.

Dellinger testified, however, that his opinion was that Riggs' failure to order a Hantavirus test on May 26, 2003, was a deviation from the standard of care. Nevertheless, according to Dellinger's deposition testimony, the failure to order a Hantavirus test on May 26 did not make a difference in Jeff's outcome.

*Perido's Expert*

Perido presented expert testimony from Dr. R.C. Trotter, a family physician in Dodge City, Kansas. Trotter had not treated any patients with Hantavirus. Trotter testified, however, that the treatment of Hantavirus with its cardiac and respiratory components fell within the realm of many other conditions that he had treated.

Trotter testified that, in his opinion, Perido met the standard of care in all regards in his treatment of Jeff, including admitting Jeff to the hospital on May 28, not transferring him to a tertiary care facility at that time, and not seeking consultation with an infectious disease specialist. According to Trotter, it is not within an infectious disease consultant's scope of practice to assist in any meaningful way in the use and management of ventilators and pressors. Trotter testified that all of the treatments to care for a Hantavirus patient were available at the facility in Elkhart and that Perido had the necessary knowledge and expertise to administer those treatments.

Moreover, Trotter testified that Riggs met the standard of care in his treatment of Jeff on May 26. Trotter further testified that the standard of care did not require Riggs to get a Hantavirus test on May 26th. According to Trotter, the Hantavirus test would not change the treatment course or Jeff's outcome because the physicians would still treat Jeff in a supportive manner and symptomatically.

*Mangosing's Expert*

Mangosing presented expert testimony from Dr. David Fitzgerald, a pulmonary critical care physician. Although Fitzgerald had recently moved to Greeley, Colorado, to practice medicine, he had previously worked for 10 years as a physician in Liberal, Kansas. In 1997 to 1999, Fitzgerald had worked in a medical clinic with Dr. Hunter. Carrie was the office manager at that clinic while Fitzgerald was there.

Fitzgerald testified that while he was working at the clinic in Liberal, he assisted with the treatment of a Hantavirus patient who was hospitalized in the intensive care unit. Moreover, Fitzgerald testified that he had two other patients in Liberal on an outpatient basis that had Hantavirus. According to Fitzgerald, the supportive treatment that can be given to patients with Hantavirus is Tylenol for the fever, cough suppressants, and anti-inflammatory medication for muscle aches in the early prodrome of the disease. Fitzgerald testified that the monitoring at that stage included instructing the patient to call if there was a change in symptoms and scheduling follow-up office visits. According to Fitzgerald, the worrisome symptom with Hantavirus was shortness of breath, which could signal that a patient was progressing to the cardiopulmonary phase of the disease. Fitzgerald testified that a Hantavirus patient in the prodromal phase could be treated either in the outpatient or hospital setting.

Fitzgerald testified that his opinion was that Mangosing's care and assessment of Jeff on May 27 was within the standard of care.

*Jury's Verdict*

At the conclusion of trial, the following claims that Riggs had deviated from the standard of care were submitted to the jury for deliberations: (1) failing to order a Hantavirus test on May 26, 2003; (2) failing to order a chest X-ray on May 26, 2003; (3) failing to admit Jeff to the hospital on May 26, 2003; (4) failing to order transfer of Mills to a tertiary care center on May 26, 2003; (5) failing to order repeat complete blood counts; and (6) failing to arrange for immediate consultation with an infectious disease expert.

The following claims that Mangosing had deviated from the standard of care were submitted to the jury for deliberations: (1) failing to provide appropriate treatment on May 27 and May 28, 2003; (2) failing to urge admission to the hospital on May 27, 2003; (3) failing to transfer Jeff to a tertiary care center on May 27, 2003; and (4) failing to urge transfer of Jeff to a tertiary care center May 27 or May 28, 2003. Mangosing alleged that Jeff contributed to his death by (1) failing to be admitted for observation in Garden City and (2) failing to follow the recommendations of other health care providers recommending hospitalization.

Finally, the following claims that Perido had deviated from the standard of care were submitted to the jury for deliberations: (1) failing to transfer Jeff to a tertiary care center before his condition deteriorated and (2) failing to arrange for an immediate consultation with an infectious disease expert. Perido alleged that Jeff contributed to his death by failing to accept recommended or available medical care and services.

At the conclusion of deliberations, the jury, in a 11-1 verdict, found none of the parties to be at fault. As a result, a defense verdict was entered in favor of the appellees.

*Fitzgerald's Testimony Concerning Personal Care of Hantavirus Patients*

On appeal, the appellants first argue that the trial court erred in allowing Fitzgerald, a defense expert, to testify concerning how he had treated other patients with Hantavirus in his personal practice. The appellants maintain that the admission of this evidence was in error because the trial court previously had denied them discovery on this same issue and because the trial court previously ruled that such evidence would be inadmissible at trial.

When a party alleges that an order in limine has been violated, the trial court must determine (1) whether the order has been violated and, if so, (2) whether the party alleging the violation has established substantial prejudice resulting from that violation. *City of Mission Hills v. Sexton*, 284 Kan. 414, 436, 160 P.3d 812 (2007). Because the trial court is in the best position to determine whether a violation occurred and to determine the degree of prejudice any

violation may have caused, the trial court's determination on these matters will not be disturbed absent a clear abuse of discretion. *Steinman v. Krisztal,* 247 Kan. 324, 328, 799 P.2d 475 (1990).

Moreover, the appellants raised this same issue in their motion for a new trial. It is within the discretion of the trial court to grant or deny a new trial under K.S.A. 60-259(a), and such decision will not be disturbed on appeal except upon a showing of abuse of that discretion. *Sexton,* 284 Kan. at 421.

*Motion to Compel*

During discovery, each of the appellees' designated experts was deposed by the appellants. Before the deposition of Fitzgerald, a notice to take deposition duces tecum with an attached exhibit was sent that requested Fitzgerald to bring the following documents, *inter alia,* to his deposition: "The chart of any patient whom he has treated for [Hantavirus] with the name, social security number, and birth date of the patient redacted." In response to the request for production of medical records, Mangosing's attorney faxed a letter to the appellants' attorney and stated that Fitzgerald would not be providing copies of the charts of patients he had treated for Hantavirus.

Following Fitzgerald's deposition, the appellants moved for an order compelling Fitzgerald to produce the requested medical records. They argued that the requested medical records were relevant to the case and necessary to determine the expert's background, knowledge, and experience with Hantavirus. After holding a hearing on November 5, 2007, the trial court issued a short journal entry in which it ruled as follows: "Upon hearing arguments of Plaintiffs' counsel and counsel for Dr. Mangosing, the Court finds that the Plaintiffs' Motion to Compel the production of the Hantavirus patient records is denied."

The appellants maintain that at the hearing on November 5, 2007, the trial court also ordered that they were not entitled to conduct discovery into Fitzgerald's personal practice in treating Hantavirus patients because the defense experts would not be allowed to testify at trial concerning their treatment of other patients. Nevertheless, the appellants have not provided this court with a

copy of the transcript of the November 5, 2007, hearing or a copy of any order from that hearing prohibiting the defense experts to testify at trial concerning their treatment of other patients.

*Pretrial Conference*

On November 21, 2007, the trial court held a pretrial conference. The lengthy written pretrial order from that conference outlines the category "Expert or Cumulative Witness Limitations" under which is the following statement: "Plaintiffs: The court made no rulings at the time of the pretrial conference." Later, in the pretrial order, the trial court entered orders that the testimony of retained experts was limited to the opinions disclosed in their expert reports and their deposition testimonies. Nevertheless, there is nothing in the pretrial order regarding any limitation on Fitzgerald's testimony concerning his treatment of other patients.

*Motion in Limine Hearing*

On December 5, 2007, the trial court held a hearing on numerous motions, including a motion in limine filed by the appellants. The appellants fail to cite to their motion in limine in the record, and it is absent from the appellate record. Apparently, within their motion in limine, the appellants requested an order prohibiting evidence from "[a]ny defense expert concerning their personal care of Jeff Mills or how they personally care for patients, including [H]antavirus patients."

At the motion in limine hearing, the trial judge and the parties engaged in a somewhat confusing discussion about what could and could not be introduced concerning a defense expert's personal care of patients. During the discussion, the trial judge indicated that whether a defense expert had treated a Hantavirus patient could be admissible for the jury to consider the weight to give the testimony but that the expert witness could not be cross-examined about the way he treated the patient:

"THE COURT: If they've never treated a patient with [H]antavirus that's probably admissible. It may go to the weight of their opinion, but not the admissibility.

"[Mangosing's counsel]: Wouldn't there have to be a foundation? Is this based on what training?

"[Riggs' counsel]: So if they haven't treated one, that's perhaps cross-examinable.

"THE COURT: Right.

"[Riggs' counsel]: If they have, the way that they have done it is not cross-examinable.

"THE COURT: That's right. Medical malpractice case

"[Mangosing's counsel]: I'm sorry.

"THE COURT: Go ahead.

"[Mangosing's counsel]: I didn't quite follow what Brian is saying.

"THE COURT: As I understand the law, just asking a doctor how he treated this particular illness doesn't establish the standard of care. And that's supposedly the topic that that doctor will be testifying—that witness will be testifying about.

"[Mangosing's counsel]: I agree that the expert has to testify 'standard of care requires this.'

"THE COURT: Right.

"[Mangosing's counsel]: He cannot say 'this is the way I would do it.'

"THE COURT: That's right.

"[Mangosing's counsel]: Or 'this is why we do it, even I read this.' He has to say whether I did it or not, the standard of care requires this.

"THE COURT: That's right.

"[Mangosing's counsel]: But this foundation is because

"THE COURT: That's the way I see it.

"[Mangosing's counsel]: or he read about it, that's a different issue. Is that right, Brian? Is that what you're saying?

"[Riggs' counsel]: Yeah.

"THE COURT: Yeah, that's what I'm saying.

"[Mangosing's counsel]: Yeah.

"THE COURT: A medical malpractice crisis: Granted."

Although the appellants refer to a written order in limine that sets out the trial court's rulings from the December 5, 2007, hearing, they provide no citation to the record, and such an order is not contained within the appellate record.

### Fitzgerald's Testimony Concerning Personal Care of Patients

Towards the beginning of Fitzgerald's direct examination at trial, Mangosing's counsel elicited testimony concerning the fact that Fitzgerald had previously been involved with the treatment of a Hantavirus patient as follows:

"Q. . . . During the time that you were in the specialty group clinic, did you have an occasion to follow a patient that had Hantavirus in the hospital?

"A. That's where I had my first exposure to a patient with Hantavirus.

"Q. And he was already hospitalized, is that correct?

"A. Correct.

"Q. And did you assist in the management of that individual in the ICU?

"A. Yes."

A couple of pages later in the trial transcript, Mangosing's counsel elicited testimony from Fitzgerald that he had also treated two other Hantavirus patients on an outpatient basis:

"Q. Doctor, I want to talk to you about, you mentioned already at my request one of the that you have one case of Hantavirus that you cared for, is that correct? We already mentioned one, is that correct, sir?

"A. The one in the hospital, yes.

"Q. Have you had experience in additional patients that were diagnosed with Hantavirus?

"A. I've had two other patients on an outpatient basis that had Hantavirus.

"Q. And these patients were all in Liberal?

"A. Yes.

"Q. And during the time that you were managing the patient in the hospital, do you remember whether or not Carrie Mills was still working as an office manager for the clinic?

"A. I believe she was.

"Q. Doctor, in terms of patients that you manage on an outpatient basis, that is, they were not hospitalized, can you tell the jury what type of symptoms that those particular patients have?"

At that point, the appellants objected based on the order in limine:

"[Mills' counsel]: Your Honor, I'm going to object. Personal practice. There's a motion in limine.

"THE COURT: Pardon me?

"[Mills' counsel]: Personal practice. There's a motion [order] in limine on this issue.

"THE COURT: I believe there is.

"[Mangosing]: I'm sorry?

"THE COURT: I believe there is a motion [order] in limine.

"[Mangosing's counsel]: I'm not asking him for opinions based on personal opinion on the personal care. That's the case of Nazarene versus Mt. Carmel Convent, Your Honor. I'm only asking for his experience as a physician.

"THE COURT: Experience and qualifications?

"[Mangosing's counsel]: Yes.

"THE COURT: Overruled."

Mangosing's counsel continued questioning Fitzgerald about his experience with Hantavirus patients as follows:

"Q. . . . Doctor, in terms of the patients which you managed in the outpatient setting, were these patients that you saw in the hospital, in the office?
"A. Yes.
"Q. And what type of symptoms does a person, the patients you have, what type of symptoms does the patient present with that may have Hantavirus?
"A. Mild flu-like symptoms.
"Q. What does that mean to us?
"A. Fever, muscle aches, cough.
"Q. And how did you manage the patients on the outpatient basis?"

At that point, the appellants again objected, and their objection was sustained:

"[Mills' counsel]: Personal practice, Your Honor.
"[Mangosing's counsel]: Based on your experience, Doctor. I'm establishing experience, Your Honor.
"THE COURT: I think I'm going to sustain that objection."

Mangosing's counsel then continued with his questioning of Fitzgerald as follows:

"Q. Let me rephrase that.
"Q. Doctor, during the time that you managed these particular patients, did any of those two patients ever require hospitalization?
"A. No.
"Q. Was there serology or was there some testing done to determine whether or not the patient in fact had Hantavirus?
"A. Hantavirus antibodies were obtained and were positive.
"Q. Doctor, based on your training and experience, with this particular virus, what type of care can be given to patients that may have Hantavirus?
"A. There's no specific treatment of Hantavirus. It's supportive care and care of the symptoms."

Several pages later in the trial transcript, Mangosing's counsel asked Fitzgerald why he would caution a patient about shortness of breath when the appellants again objected to Fitzgerald's testimony:

"Q. Dr. Fitzgerald, I was visiting with you about the symptoms that you would advise a patient about the shortness of breath, and I asked you why you would say—what was the reason you would mention shortness of breath, and I asked you why you would say—what was the reason you would mention shortness of breath or caution for the patient to look out for any shortness of breath?

"[Mills' counsel]: Your Honor, again, personal practice. He's talking about the standard of care.

"THE COURT: Overruled.

"[Mangosing's counsel]: Go ahead, Doctor.

"A. [Fitzgerald:] Shortness of breath would be a symptom that I would be concerned about that may suspect that a patient is progressing to the cardiopulmonary phase of the disease."

Later, when Fitzgerald injected a comment that he had treated Hantavirus patients in Liberal, Kansas, the trial court sustained the appellants' objection and motion to strike the testimony:

"Q. In your opinion, Doctor, based on your training and experience, is tertiary care centers the only place that a patient who might have Hantavirus can be treated?

"A. No.

"Q. Or looked after, I should say?

"A. We did at Liberal.

"[Mills' counsel]: Objection, move to strike. Personal practice.

"THE COURT: Sustained."

The appellants again objected when Fitzgerald testified about his instructions to his Hantavirus outpatients:

"Q. [Mangosing's counsel:] And if you do it outpatient, what is done in that regard?

"A. [Fitzgerald:] I have the patient call to instruct if there's any change and I usually see them on a daily basis.

"[Mills' counsel]: Your Honor, again, move to strike. Personal practice as to what he does.

"[Mangosing's counsel]: I'll withdraw that.

"THE COURT: Okay."

### Improper Standard of Care Testimony

In arguing that Mangosing's questioning of Fitzgerald was improper, the appellants cite *Karrigan v. Nazareth Convent & Academy, Inc.*, 212 Kan. 44, 510 P.2d 190 (1973), and *Cox v. Lesko*, 23 Kan. App. 2d 794, 935 P.2d 1986 (1997), *aff'd in part and rev'd in part* 263 Kan. 805, 953 P.2d 1033 (1998). Although the issue in *Karrigan* is different from the issue here, our Supreme Court set forth the rule that " '[e]vidence is not admissible to show what another would have done under the circumstances, or that he would have treated the patient in some other way, or to show how

defendant's treatment of like cases differed from that of other physicians.' " 212 Kan. at 50 (quoting 70 C.J.S. Physicians & Surgeons § 62, p. 998). In *Cox*, this court cited the rule set forth in *Karrigan*. This court determined that allowing the plaintiff to cross-examine an expert witness on how he preferred to treat the type of injury that the plaintiff sustained would unduly emphasize one approach over another and was not relevant in determining whether the defendant deviated from the standard of care. 23 Kan. App. 2d at 798-99.

### Trial Court's Ruling on Motion for New Trial

The appellants raised the present issue in their motion for a new trial, but the trial court rejected their argument for the following reasons: (1) they failed to make a contemporaneous objection in many instances; (2) most of their objections were sustained; (3) the objections not sustained were because the evidence related to foundation or Fitzgerald's experience; and (4) Fitzgerald's testimony was substantially within the guidelines of the order in limine.

### Failure to Make a Contemporaneous Objection

As the trial court correctly pointed out, the appellants failed to make a contemporaneous objection to the majority of Fitzgerald's testimony that they now complain about on appeal. When the trial court grants an order in limine and the prohibited evidence is introduced at trial, the moving party must object at trial to the admission of the evidence to preserve the issue for appeal. *Griffin v. Suzuki Motor Corp.*, 280 Kan. 447, 470, 124 P.3d 57 (2005); see also *State v. King*, 288 Kan. 333, 348, 204 P.3d 585 (2009) ("[A] party must lodge a timely and specific objection to the admission or exclusion of evidence in order to preserve the evidentiary question for review."); K.S.A. 60-404 ("A verdict or finding shall not be set aside . . . by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection."). As a result, in those instances where the appellants did not make a contemporaneous objection to the complained-of line of questioning and testimony, they failed to preserve the issue for appeal.

*Overruled Objections—Testimony Within Scope of Order in Limine*

Out of the five objections made by the appellants, the trial court overruled only two of those objections. The first objection which the trial court overruled was to the question concerning the types of symptoms that Fitzgerald's outpatients experienced. Nevertheless, Mangosing's counsel rephrased his question to a more general question, "And what type of symptoms does a person, the patients you have, *what type of symptoms does the patient present with that may have Hantavirus?*" (Emphasis added.) This question was within the scope of the trial court's order in limine from the December 2007 hearing because it did not ask Fitzgerald to provide information concerning how he personally cared for his Hantavirus patients. Rather, this question was similar to those asked of other experts at trial about the symptoms of Hantavirus. As Mangosing attempted to get into how Fitzgerald managed his patients on an outpatient basis, the trial court sustained the appellants' objection. As a result, there was no violation of the order in limine.

The second question where the trial court overruled the appellants' objection was when Mangosing's counsel asked, "[W]hat was the reason you would mention shortness of breath or caution for the patient to look out for any shortness of breath?" After the objection was overruled, Fitzgerald responded, "Shortness of breath would be a symptom that I would be concerned about that may suspect that a patient is progressing to the cardio[respiratory] phase of the disease." Although Fitzgerald's testimony related to a symptom that he would look for in a Hantavirus patient, it did not relate to how he personally cared for and treated the Hantavirus patient. His testimony was similar to that given by the other experts in the case as to how the Hantavirus disease progressed from the prodrome phase to the cardiorespiratory phase. As a result, it is apparent that Mangosing's counsel's question and Fitzgerald's testimony did not violate the trial court's order in limine.

*Refusal to Allow Discovery Concerning Dr. Fitzgerald's Personal Practice*

The appellants contend that the error in admitting Fitzgerald's testimony concerning his personal practice was compounded by the trial court's refusal to allow them to conduct discovery concerning Fitzgerald's personal practice.

The problem with the appellants' argument is that they have not provided this court with a transcript or a written order that explains the trial court's reasoning to not allow discovery of Fitzgerald's patients' redacted medical records. As a result, this court cannot adequately review why the trial court would not allow discovery of this information. "An appellant has the duty to designate a record sufficient to establish the claimed error. Without an adequate record, the claim of alleged error fails. [Citations omitted.]" *State ex rel. Stovall v. Alivio*, 275 Kan. 169, 172, 61 P.3d 687 (2003). Assertions made in an appellate brief are not sufficient to satisfy inadequacies in the record on appeal. *State v. Bloom*, 273 Kan. 291, 307, 44 P.3d 305 (2002).

Moreover, another glaring problem with the appellants' argument is that they have not pointed to anywhere in the record where they told the judge presiding over the trial the reason that Fitzgerald should be prohibited from testifying about his experience in treating Hantavirus patients. The appellants should have explained to the trial judge that they were never allowed to obtain information about those patients to adequately cross-examine Fitzgerald.

A different judge presided over the motion to compel hearing than the judge who entered the pretrial order and presided over the trial. Although the appellants contend that there was an order entered at the motion to compel hearing that they were not entitled to conduct discovery into Fitzgerald's personal practice in treating Hantavirus patients because the defense experts would not be allowed to testify at trial concerning their treatment of other patients, such a detailed order is not contained in the appellate record. Moreover, there is no evidence of such a ruling in the pretrial order.

At the motion in limine hearing, when the trial court considered whether to exclude the testimony of defense experts concerning their personal care of patients, the appellants did not argue to the trial court that they had been prohibited from discovery of Fitzgerald's patients' records. Further, and perhaps most important, the appellants never made such an argument to the trial judge when they objected to Fitzgerald's testimony. In this massive case that extended for more than 3 years from the filing of the petition to the jury trial, the appellants had the responsibility to adequately argue to the trial court why the admission of Fitzgerald's testimony would be so prejudicial to their case. In the absence of such an argument, the appellants have not made a sufficient record to establish their claim of error on this point. See *Kelly v. VinZant*, 287 Kan. 509, 526, 197 P.3d 803 (2008) ("An appellant has the burden to designate a record sufficient to establish the claimed error; without such a record, the claim of error fails.").

*Juror's Affidavit*

In arguing that the jury's verdict was rendered in reliance on Fitzgerald's testimony concerning his personal practice, the appellants cite to an affidavit that was filed in support of their motion to set aside the judgment and for a new trial. The affidavit was prepared by the juror who dissented from the 11-1 verdict in favor of the appellees and details how the jury used the evidence presented by Fitzgerald to reach its verdict.

Nevertheless, the appellees argue that the affidavit should not be considered by this court because it invades the province of the jury and violates K.S.A. 60-441. The appellants contend, however, that this court can properly consider the affidavit under K.S.A. 60-444.

Recently, our Supreme Court explained the dichotomy between K.S.A. 60-441 and K.S.A. 60-444 as follows:

"The law governing impeachment of jury verdicts is founded on two competing considerations. On one hand, is the requirement that the case be decided solely on the evidence presented and the instructions given to a fair and impartial jury. To this end, K.S.A. 60-444(a) provides that a juror is allowed to testify as a witness 'to conditions or occurrences either within or outside of the jury room having a material bearing on the validity of the verdict or the indictment, except as expressly

limited in K.S.A. 60-441.' On the other hand, there is a need for confidentiality of deliberation and verdict finality. Diehm, 65 St. John L. Rev. at 394; see Concannon, 52 J.K.B.A. 201. This need results in a conclusion that public policy forbids the questioning of a juror on the mental processes individual jurors used in reaching a verdict because 'there is no possible way to test the truth or veracity of the answers.' *Kincaid v. Wade*, 196 Kan. 174, 178, 410 P.2d 333 (1966). This policy is codified in K.S.A. 60-441, which prevents a court from considering any evidence that attempts to 'show the effect of any statement, conduct, event or condition upon the mind of a juror as influencing him or her to assent to or dissent from the verdict or indictment or concerning the mental processes by which it was determined.'

"In balancing these competing policies, this court normally does not allow testimony or affidavits of jurors to impeach a verdict where it is not obvious from the verdict that the jury failed to follow jury instructions. *Jones v. Sigg*, 261 Kan. 614, 621, 930 P.2d 1077 (1997). Exceptions are recognized, however, if a jury intentionally disregards a court's instructions or violates one or more of the essential formalities of proper jury conduct. One such long-standing exception applies 'where a juror alleges the jury entered into a conscious conspiracy to circumvent the deliberation process by engaging in conduct which produces a quotient verdict.' 261 Kan. at 621-22 (citing *City of Ottawa v. Heathman*, 236 Kan. 417, 425, 690 P.2d 1375 [1984] )." *Williams v. Lawton*, 288 Kan. 768, 797-98, 207 P.3d 1027 (2009).

Thus, under K.S.A. 60-441, a court is prohibited from considering any evidence that relates to the mental processes of jurors in arriving at a verdict. This assures the finality of verdicts and protects against the corruption of jurors after discharge. A court, however, may consider evidence to impeach a verdict when the evidence will show actions of the jurors by which they have intentionally disregarded the trial court's instructions or violated one or more of the essential formalities of proper jury conduct. *Verren v. City of Pittsburg*, 227 Kan. 259, 261, 607 P.2d 36 (1980) (citing VIII Wigmore on Evidence, § 2348 [McNaughton rev. 1961]).

The juror's affidavit filed in this case sets forth certain evidence that was admitted at trial and discusses how the jurors used that evidence during the deliberation process to arrive at the verdict. This information relates to the jurors' mental processes and will not be considered by this court. Although the appellants argue that the affidavit can be considered under K.S.A. 60-444, there is nothing in the affidavit to even suggest that the jurors intentionally

disregarded the trial court's instructions or violated an essential formality of proper jury conduct. As a result, the appellants' argument urging this court to consider the juror's affidavit lacks merit.

Based on the circumstances present in this case, we find no abuse of discretion in the trial court's decision to deny the appellants a new trial on the issue concerning the admission of Fitzgerald's testimony.

*Testimony Concerning Carrie's Medical Treatment for Hantavirus*

Next, the appellants argue that the trial court erred in not ordering a new trial based on the appellees' violations of the trial court's orders prohibiting the introduction of evidence concerning the medical treatment that was and was not provided to Carrie while she was hospitalized at KU Med for Hantavirus.

It is within the discretion of the trial court to grant or deny a new trial under K.S.A. 60-259(a), and such decision will not be disturbed on appeal except upon a showing of abuse of that discretion. *City of Mission Hills v. Sexton,* 284 Kan. 414, 421, 160 P.3d 812 (2007).

Before trial, the appellants moved to exclude any evidence regarding whether Carrie's medical providers complied with or deviated from the standard of care. The trial court granted the appellants' motion and stated that how Carrie was taken care of was irrelevant to this case. Nevertheless, the trial court noted that "what [Carrie] talks about on direct examination is fair game on cross-examination. But . . . if she doesn't talk about going to the KU Med Center or any of that stuff on direct examination, you can't bring it up."

During the middle of trial, Mangosing's counsel argued that based upon the evidence that had come out concerning Carrie's illness and her hospitalization for Hantavirus, the appellees should be able to ask Carrie and other witnesses about what Carrie knew. Moreover, Mangosing's counsel argued that the appellees should be able to use Carrie's medical records if something was said that was different from the medical records. Refusing to admit Carrie's medical records, the trial court stated the case was not about what

Carrie received in treatment, where she was treated, or how she was treated. The trial court stated, however, that the parties could ask Carrie about the knowledge she gained from the result of her illness and whether she conveyed that to Jeff.

On cross-examination at trial, Riggs' counsel questioned Carrie about her concern for Jeff's condition based upon her own experience with Hantavirus as follows:

"Q. The reason you knew that you were concerned was because of what you had gone through, right?

"A. Yes.

"Q. One of the things that I noticed that you said was that you knew from your doctors that they didn't like the oxygen to be below 92. Do you remember saying that?

"A. Yes.

"Q. And when you saw Jeff's oxygen go below 92, that concerned you, correct?

"A. Yes.

"Q. Okay. Now, I listened very carefully to your answers that you were giving to your lawyer's questions, and I never heard him ask you whether or not you tested positive for Hantavirus. Did you?

"A. Did I test positive?

"Q. Yeah.

"A. Yes.

"Q. Okay. And so when you learned that you had Hantavirus, that made you concerned that Jeff might have it, right?

"A. Yes.

"Q. Okay. And you learned that you had Hantavirus after you'd come to Garden City, didn't you?

"A. I don't remember when I learned it.

"Q. Well, you know that your doctor had to order a test, right, out here at Garden City? Dr. Hansen?

"A. I do not remember that he ordered it."

Although the appellants now argue that the line of questioning concerning Carrie's test for Hantavirus was a direct violation of the trial court's ruling, the appellants failed to make a contemporaneous objection to Riggs' counsel's questions concerning Carrie's Hantavirus test. As a result, the appellants' argument has not been preserved for appeal. See *Griffin v. Suzuki Motor Corp.*, 280 Kan. 447, 470, 124 P.3d 57 (2005) (When the trial court grants an order in limine, and the prohibited evidence is introduced at trial, the moving party must object at trial to the admission of the evidence

to preserve the issue for appeal.); *State v. King*, 288 Kan. 333, 348, 204 P.3d 585 (2009) ("A party must lodge a timely and specific objection to the admission or exclusion of evidence in order to preserve the evidentiary question for review."); K.S.A. 60-404 ("A verdict or finding shall not be set aside . . . by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection.").

The appellants also point to the following cross-examination of Carrie as violating the trial court's order in limine:

"Q. [Riggs' counsel:] You went to the hospital at Joplin, when you were there visiting your sister, on early Sunday morning, correct?

"A. [Carrie:] Yes.

"Q. You had gone for laboratory to be drawn on the day before, correct?

"A. Yes.

"Q. But you were not admitted on the first day that you presented for medical care with what ultimately came to be diagnosed as Hantavirus, correct?

"[Mills' counsel]: Objection to relevance, Your Honor. This is in the Court's order in limine.

"[Riggs' counsel]: It's in direct examination.

"THE COURT: Overruled.

"[Riggs' counsel]: Go ahead.

"A. No, I was not admitted that day that I went to get lab drawn.

"Q. Okay. And you had concerns at that time about flu-like symptoms, right?

"A. I had a fever and I had a headache and I was achy. I was starting to cough.

"Q. You knew that, by the time Jeff was going to the hospital, you knew that one of the signs of some viral infections, including Hantavirus, was low platelets, correct?

"A. Yes.

"Q. And you know that your own platelets were very low when you were treated?

"A. Yes.

"Q. Lower than Jeff's ever were, right?

"A. I don't remember what my platelets were. I remember they dropped."

Nevertheless, during that entire line of questioning, the appellants raised only one objection. In that instance, the trial court was correct to overrule the objection because Carrie had testified on direct examination that she had not been admitted to the hospital when she first went on Saturday for lab work. As demonstrated in the quoted material above, the appellants never objected to any of

Riggs' other questions relating to Carrie's condition. As the party requesting the order in limine, the appellants had the burden to object at trial to the admission of any evidence prohibited by the order in limine. By not making a contemporaneous objection at trial to the admission of such evidence, the appellants failed to preserve their issue for appeal. See *Griffin*, 280 Kan. at 470.

Moreover, even if the appellants had properly preserved their issue for appeal, it is apparent that the complained-of testimony did not violate the trial court's order in limine. During trial, the trial court modified its ruling to allow the parties to ask Carrie about the knowledge she gained from the result of her illness and whether she conveyed that to Jeff. In cross-examining Carrie about her condition, Riggs' counsel related what Carrie knew about her illness and the information she gained during her hospitalization to the symptoms she became concerned about in Jeff. Such questioning was in line with the trial court's modified ruling concerning Carrie's illness.

In denying the appellants' motion for a new trial, the trial court found that any questions asked by defense counsel regarding Carrie's medical treatment were within the scope of direct examination. The trial court further determined that the questions were not in violation of the order in limine because the order in limine specifically stated that if appellants' counsel opened the door regarding the treatment at KU Med, then follow-up questions would be appropriate.

Indeed, before Carrie testified at trial, the appellants had elicited testimony from Mangosing that when Carrie had Hantavirus, she had been sent to KU Med's intensive care unit and had then been transferred to Garden City. Then, during Carrie's direct examination at trial, the appellants' attorney elicited testimony indicating that Carrie had initially gone to the hospital in Joplin on Saturday to do some lab work, had been admitted to the hospital in Joplin on Sunday, and had then been transferred to KU Med's intensive care unit.

The appellants also elicited testimony from Iway that within minutes of seeing Jeff on May 29th, he suggested that Jeff needed to be transferred to KU Med. Moreover, Hjelle, the appellants'

expert witness, had testified that the standard of care would involve sending Jeff to a known high quality tertiary care center like in Wichita or at KU Med.

In civil cases, Kansas courts follow the rule that if one party offers an inadmissible fact into evidence, the other party may introduce a similar inadmissible fact " 'whenever it is needed for removing an unfair prejudice which might otherwise have ensued from the original evidence.' [Citation omitted.]" *McKissick v. Frye,* 255 Kan. 566, 578-79, 876 P.2d 1371 (1994).

Here, before Carrie testified at trial, the appellants had focused in on the fact that Carrie had been transferred to KU Med for treatment of her illness and that the standard of care required transfer to such a facility. In opening statements, the appellants twice mentioned the fact that Carrie had been in the intensive care unit at KU Med. Despite the trial court's initial determination that Carrie's medical treatment was not relevant to the present case, the appellants had made statements and asked questions concerning Carrie's hospitalization after she was infected with Hantavirus.

The appellees point out that the obvious strategy by the appellants in this case was to employ Carrie herself as a *"de facto* 'Exhibit A,' who survived under treatment at KU, in contrast to her husband who died during treatment in southwest Kansas, seeking to have the jury infer negligence from the mere fact of the different outcomes." Throughout the case, the appellants implied that if Jeff would have been transferred to a tertiary care facility like KU Med, like Carrie had been, he would have recovered, like Carrie did, from Hantavirus.

The appellants' implied argument in this case was as follows: When Carrie was ill with Hantavirus, she was admitted to KU Med. While at KU Med, her condition improved and she was released from there to recuperate closer to her home. Carrie's recovery of her health from Hantavirus presents a marked contrast to Jeff's death caused by Hantavirus, and Jeff was not treated at KU Med or at any other tertiary medical center.

The appellants' linking Carrie's recovery to her treatment at KU Med to Jeff's death and not being treated at a tertiary medical center like KU Med seems post hoc. The mere fact that Carrie was

treated at KU Med, and then her condition or health improved, is shaky ground for arguing that her recovery from Hantavirus was caused solely by the treatment she received at KU Med. Based on the statements and evidence that were presented by the appellants to the jury, the appellees properly elicited testimony that certain aspects of Carrie's care were not much different than the care that had been provided to Jeff but resulted in different outcomes.

Because the appellants had previously introduced evidence concerning Carrie's hospitalization for Hantavirus, there was no error in the appellees' cross-examination of Carrie on this issue. As a result, we find no abuse of discretion in the trial court's decision to deny the appellants a new trial on this issue.

*Sufficiency of Evidence to Support the Verdict*

Finally, the appellants argue that a new trial should have been granted to them because the verdict rendered by the jury was contrary to the great weight of the evidence.

When a verdict is challenged as being contrary to the evidence, an appellate court does not reweigh the evidence or pass on the credibility of the witnesses. If the evidence, when considered in the light most favorable to the prevailing party, supports the verdict, the appellate court should not intervene. *Sexton*, 284 Kan. at 422.

The appellees in this case presented testimony from multiple experts that Riggs, Mangosing, and Perido had not deviated from the standard of care. Specifically, Trotter testified that Riggs met the standard of care in his treatment of Jeff on May 26th. In addition, Fitzgerald testified that Mangosing's care and assessment of Jeff on May 27th was within the standard of care. Trotter further testified that Perido met the standard of care in all regards in his treatment of Jeff, including admitting Jeff to the hospital on May 28th, in not transferring Jeff to a tertiary care facility at that time, and in not seeking consultation with an infectious disease specialist.

Trotter explained that all of the treatments to care for a Hantavirus patient were available at the facility in Elkhart and that Perido had the necessary expertise to administer the treatments. Iway, who worked with Perido on May 29th in trying to stabilize

Jeff, testified that they could definitely take care of a patient who was in shock and cardiac arrest at the facility in Elkhart and they could also manage and stabilize the patient in critical care for a few hours until transfer could be made to a tertiary care facility. Moreover, Fitzgerald testified that all internal medicine doctors have intensive care unit training where they should be able to manage mechanical ventilators and the initial presentation of shock.

Dellinger supported both Fitzgerald's and Trotter's opinions with his testimony that even if Jeff would have been transferred to a tertiary care center, his outcome, more likely than not, would not have been altered. According to Fitzgerald, more likely than not, consultation with an infectious disease specialist on May 26, admission of Jeff to the hospital on May 26, and transfer to a tertiary care center on May 26, 27, or 28 would not have altered Jeff's outcome.

Iway testified that he had some experience previously with another Hantavirus patient where the patient was transferred to Wichita on the day she came into the emergency room. Nevertheless, the patient died the same day on a respirator in Wichita. According to Iway, the chance of survival with the illness that Jeff had was "very minimal wherever you are."

In addition to the expert testimony that the appellees had not breached the standard of care in their treatment of Jeff, there was also testimony from Hunter, who was Carrie's sister, and Easterwood, who was Carrie's mother, that Jeff had resisted getting treatment for his condition. According to Hunter, both she and Carrie had to stress to Jeff the severity of Hantavirus so that he would see a doctor for his illness. Easterwood testified that Carrie had to tell Jeff on May 26 that he could not play with the band that night if he did not get a blood test. According to Easterwood, Jeff did not want to be admitted to the hospital in Garden City on May 27 and instead wanted to be closer to home in Elkhart. Hunter testified that after Jeff died she explained to Jeff's family that Jeff had been resistant to being in the hospital because he had a family to take care of and things to do.

In arguing that the jury's verdict was not supported by the evidence, the appellants choose bits and pieces of the experts' testi-

mony to argue that the evidence showed that the appellees deviated from the standard of care. For example, the appellants point out that Dellinger's deposition testimony was that Riggs deviated from the standard of care by failing to order a Hantavirus test on May 26. Nevertheless, contrary to Dellinger's deposition testimony, Trotter testified that the standard of care did not require Riggs to order a Hantavirus test on May 26. Moreover, according to Dellinger and Trotter, Riggs' failure to order a Hantavirus test on May 26 did not change the treatment course or Jeff's outcome.

In addition, the appellants point to isolated bits of Fitzgerald's deposition testimony where, in response to a question whether Mangosing's failure to chart in the records his recommendation for Jeff to be hospitalized would constitute a violation of the standard of care, Fitzgerald stated that it would. Nevertheless, at trial, Fitzgerald testified that Mangosing did not deviate from the standard of care by discharging Jeff home on May 27.

Moreover, Mangosing testified that he had recommended hospitalization to Jeff on May 27 but that he believed that Jeff did not want to be admitted. Carrie's mother corroborated Mangosing's testimony when she testified that she remembered a conversation that occurred between herself, Carrie, and Jeff after Jeff's appointment on May 27 concerning Mangosing's recommendation to admit Jeff to the hospital in Garden City. Nevertheless, according to Carrie's mother, Jeff wanted to go to the hospital in Elkhart so that he would be closer to home.

The appellants further point to isolated testimony from Fitzgerald that patients with suspected Hantavirus are supposed to be given broad spectrum antibiotic therapy pending serologic confirmation of infection and that Mangosing had not ordered any antibiotics on May 27. Nevertheless, Fitzgerald testified that Mangosing's failure to order antibiotics on May 27 was not a deviation from the standard of care. Fitzgerald explained his opinion as follows: " 'At the time [Jeff] saw Dr. Mangosing, there was fever, nonproductive cough, white count was low, x-rays showed some interstitial changes, all consistent with a viral prodrome, and antibiotics weren't needed.' " According to Fitzgerald, antibiotics would help only if there was a bacterial infection, not a virus.

The appellants also point out that neither Dellinger nor Trotter had ever treated a Hantavirus patient but yet testified to the standard of care for treating Jeff, a Hantavirus patient. Nevertheless, this information was brought out during Dellinger's and Trotter's testimony. Both Dellinger and Trotter also testified that although they had never treated a Hantavirus patient, they had treated patients with cardiovascular and respiratory issues similar to what a Hantavirus patient in the cardiorespiratory phase would undergo. It was within the province of the jury to consider this information and to determine what weight to give to the experts' opinions. See *Johnson v. Westhoff Sand Co.*, 281 Kan. 930, 954, 135 P.3d 1127 (2006) ("It is not the function of the appellate court to reweigh the evidence.").

Essentially, the appellants are urging this court to reweigh the testimony that was presented to the jury at trial. Nevertheless, "[t]he jury is charged with the responsibility of weighing the evidence and determining witness credibility. Appellate courts do not reweigh the evidence or decide which witnesses are credible." *State v. Corbett*, 281 Kan. 294, 310, 130 P.3d 1179 (2006). When considering the evidence in this case, in the light most favorable to the appellees, this court should find that there was sufficient evidence to support the jury's verdict.

Affirmed.